(No. 17917.

THE CHICAGO TITLE AND TRUST COMPANY, Trustee, *et al.*
Appellants, *vs.* ISADORE SCHWARTZ *et al.* Appellees.

*Opinion filed April 17, 1930.*

GOTTLIEB, SCHWARTZ & MARKHEIM, and NORBERT B. TYRRELL, (SHERMAN C. SPITZER, ULYSSES S. SCHWARTZ, CLAUDE A. ROTH, and CHARLES L. BARTLETT, of counsel,) for appellants.

COBURN, KEARNEY & COBURN, for appellees.

Mr. COMMISSIONER EDMUNDS reported this opinion:

The Chicago Title and Trust Company, A. H. Welch, Nathan Lapidus, Henry A. Eck, F. W. Morf, George Middendorf, Henry E. Coyne, Peter Wessies and Harry Snyder, appellants, formed an association known as the Produce Service Trust, the general purpose of which was to acquire property for a new produce market in the city of Chicago. The present suit was brought by them in the circuit court of Cook county to obtain specific performance of a real estate contract executed under the circumstances hereinafter described. There was a hearing by the chancellor, and from

a decree dismissing the bill for want of equity this appeal was taken.

Under date of August 20, 1924, appellants acknowledged that they signed, sealed and delivered a certain instrument captioned "Produce Service Trust—Declaration of Trust." The Chicago Title and Trust Company was designated therein as "corporate trustee" and the individuals above named were designated as "individual trustees." By the terms of the instrument the individual trustees were vested with full power to manage and control the affairs and property of the trust, but it was contemplated that the corporate trustee should hold the legal title to all trust property, the funds for acquiring property to be furnished by the individual trustees and other persons, the corporate trustee to issue certificates to such contributors evidencing their proportionate shares in the trust property, and the corporate trustee to have the power, at the direction of the individuals, to institute and maintain suits relating to such property. The liability of the individual trustees was limited to the funds in the hands of the trustees, and it was expressly stated that neither the corporate trustee nor the individual trustees should be personally liable for any debt, damage, judgment or decree, it being specifically provided that the corporate trustee should have "no power or authority to enter into any contract that shall bind or affect the individual trustees personally or the shareholders personally or call upon them for any payment whatever other than the amounts of their respective subscriptions." As to how the trust operated, appellants explain that when the South Water street merchants decided to locate their market in the new vicinity they employed the real estate firm of Terwilliger & Co. to purchase for them the property upon which the market proper was to be located and also to acquire surrounding property for protective purposes. In the course of such transactions Terwilliger & Co., whose offices were on Blue Island avenue, handled over two hun-

dred pieces of property for the Produce Service Trust. The vendee named in the contract here sought to be enforced was Marshall A. Russow, who was at that time an employee of the Chicago Title and Trust Company and continued in such employment until about two months before the hearing in the present suit.

About ten months before August 16, 1924, the date of the contract here sued upon, Nathan Orloff, who had conducted a real estate business in the vicinity of Fourteenth street and Blue Island avenue for fifteen years and had known Isadore Schwartz for ten or twelve years, had a talk with Isadore. Isadore and his wife, Paulina, were title holders of record of the property here involved. In the course of the talk Isadore told Orloff he wanted to sell the property, placed a price of $2500 upon it, and listed it with Orloff. James Rosenthal, a member of the firm of Terwilliger & Co., who had been operating in the neighborhood of Fourteenth and Fifteenth streets for twenty years, testified for appellants on direct examination that shortly before the contract here involved was executed he called Orloff up and asked him if he had any property listed in that vicinity, stating that some people wanted to put up a hotel and garage. Orloff told him he had quite a few pieces, and witness bought quite a number of pieces through Orloff. This was confirmed by Orloff. As to the Schwartz property, Rosenthal was asked on cross-examination, "You got Mr. Orloff to go out and help you buy this property?" His answer was, "Yes, sir." He further testified that it was agreed between him and Orloff that they would split the commission which Orloff would receive from the Schwartzes. He denied that he personally paid Orloff any commission on the buyer's side of the deal, but testified that his firm, "or somebody connected with this buying," paid Orloff a commission. It does not appear that the Schwartzes were informed or knew that Orloff was receiving any other commission than that which they were to

pay as vendors or that they knew anything else about the relationship between Orloff and Terwilliger & Co. Orloff conducted Isadore and Paulina to the Terwilliger office to close the contract, and the testimony upon behalf of appellees, as will presently appear, was to the effect that Orloff there joined with Rosenthal in putting strong pressure upon them to sign the instrument.

On August 16, 1924, Orloff took to the Terwilliger office, in an automobile, Isadore and Paulina, also Isadore's sister, Sarah Moskovitz, and nephew, Sam Moskovitz. The testimony as to what happened there is in conflict. That in behalf of appellees, given by Isadore, Paulina, Sarah and Sam Moskovitz and Harry Schwartz, a letter carrier, son of Isadore and Paulina, is substantially to the effect that Rosenthal was informed that while the premises upon which Isadore and Paulina lived, and which it was proposed that they should sell, were in their names, the property did not belong to them but to Isadore's father, Joseph Schwartz, and that they could not, therefore, enter into contract of sale therefor; that Joseph was out of the city and would not be back for several days, at which time the question could be taken up with him. Thereupon Orloff and Rosenthal stated that the premises would have to be sold immediately and that "condemnation proceedings" would be instituted the next day, as arrangements had already been made to build a garage and gas filling station on said lot and lots adjacent thereto; that Rosenthal stated that he knew Joseph Schwartz well, having organized a lodge with him, and was sure Joseph would be satisfied to sell for $4000; that if Joseph was not satisfied with the price or did not desire to sell, any contract made by Isadore and Paulina would be surrendered and canceled; that with such understanding Isadore and Paulina signed the contract in question. The testimony given upon behalf of appellants by Rosenthal and Orloff directly disputes these assertions. Both of these latter witnesses insist that nothing was said

about Joseph Schwartz being the real owner of the premises, that no threats were made about condemnation, and that there was no agreement to cancel the contract at any time.

The contract provided for a purchase price of $4000 and recited the payment of $400 as earnest money, the balance to be paid after title was accepted. It contained, among other provisions, the following: "Should said purchaser elect not to perform this contract promptly on his part, at the time and in the manner herein specified, the earnest money paid as above shall be retained by the vendor as liquidated damages and this contract shall thereupon become and be null and void." Isadore Schwartz signed his own name and Paulina signed by mark. The name of Russow, the vendee, was not on the instrument when the Schwartzes signed. The testimony showed that Isadore worked in a tailor shop. He and Paulina were both ignorant people, Isadore being unable to read much or to write, beyond signing his name, and Paulina being unable to read or write.

Joseph and Isadore Schwartz testified that after Joseph returned to the city a few days later they visited the Terwilliger office and tendered back to Rosenthal the $400, demanding back the above contract; that Rosenthal replied he did not have the contract there and to come back later; that they went again later and Rosenthal said the buyer was a man by the name of Russow, who was not in Chicago, and did not inform the Schwartzes how or where to reach him. All this was denied by Rosenthal. On the evening of November 24, 1924, C. L. Smith, an attorney representing the Produce Service Trust, together with Orloff, Rosenthal and several uniformed policemen, appeared at the home of Isadore and Paulina, made tender of $3600 and demanded that the deal be closed. The tender was refused.

On December 12, 1924, Joseph Schwartz filed a bill in the circuit court of Cook county, making Isadore, Paulina and Russow defendants, praying that the contract be re-

moved as a cloud upon his title and that the premises be conveyed to him. When Isadore was served with summons he retained Martin M. Gross as his solicitor. While this latter action was pending, about January 15, 1925, attorney Smith arranged a meeting at the Terwilliger office. Those present were Smith, Gross, Rosenthal, Isadore and Paulina, J. F. Bilger, and W. C. Taggert, of the Chicago Title and Trust Company. Joseph Schwartz was brought to the meeting later. Gross testified that Smith asked that Joseph be sent for. Smith admitted this in one part of his testimony and denied it in another. Gross also testified that at this meeting he discussed with Bilger and Smith the merits of Joseph's suit, and that they said they knew all about it and that was why they wanted Joseph brought to the meeting. Gross further testified that Joseph told them he did not want to sell; that Smith said he would go as high as $6000, then $7000, then $8000, but Joseph refused to sell for less than $15,000; that Smith said he was representing Russow; that Rosenthal admitted that he remembered being told by Isadore when the contract was signed that Isadore did not own the property. Smith testified that Gross told him at this meeting about Joseph's interest, and that Bilger, Gross and himself discussed the theory of Joseph's alleged trust but that nothing was said about Joseph's suit, which he knew nothing about. Smith further testified that in the course of the meeting he said he would try to get for the Schwartzes as much as $8000 if the conveyance could be had without suit. Bilger and Taggert testified that they did not remember anything being said about a lawsuit by Joseph Schwartz against Isadore and Paulina Schwartz and Russow, but that they could not remember all conversations dealing with titles because they were handling too many deals. The meeting finally broke up without result.

On February 2, 1925, a decree was entered in the suit instituted by Joseph Schwartz decreeing that Joseph was the owner of the property here involved and that the con-

tract of August 16, 1924, be canceled. On February 3 Isadore and Paulina conveyed the property by warranty deed to Joseph Schwartz in accordance with the terms of the decree. Subsequently, appellants instituted the present suit.

As to the value of the property involved, Rosenthal testified that he was well acquainted with the neighborhood before the market came there and watched the development as to values, that "there was nothing there before;" that in June, 1924, the Schwartz property was worth $2200; that on August 16, 1924, at which time, "pretty near," he knew that the market had decided to come out to that location, the Schwartz property was worth the same as in June. On August 16, 1924, however, Rosenthal was obviously acting to purchase the property in direct anticipation of the market's coming. Under cross-examination he testified to buying the Mahoney lot, in the same block as the Schwartz lot, for around $30,000. He further testified that he bought the Matchett lot, the same size as the Schwartz lot and almost directly across the street from it, for $52,000.

In support of the decree entered appellees rely upon a number of considerations. They argue that appellants, as undisclosed principals, necessarily stand in the same shoes as Russow, their agent and the named party to the contract, and point out that by decree of a court of chancery in due course Russow has been foreclosed from enforcing the instrument; that the Chicago Title and Trust Company sues here in a trustee capacity only, under an instrument which had not even been acknowledged and delivered at the time the contract sued upon was made, and by the terms of which agreement, when subsequently effective, appellees could have had no effective remedy at any time against appellants because of the provisions thereof limiting the liability of all parties concerned therein; that the signatures to the contract were procured by fraud and misrepresentation; that the provision of the contract which in

effect gave the vendee the alternative of forfeiting the earnest money and putting an end to further obligation under the contract, made it unenforcible for want of mutuality; and that the contract is unenforcible because Orloff acted as agent for both sides and worked hand in hand with appellants without disclosure to his original principals.

Appellants urge that they were not made parties to the suit against Russow in which the contract was canceled and are therefore not bound by that decree; that the provisions of the trust agreement between appellants could not affect persons without notice and are of no concern to appellees; that no fraud or misrepresentation was proved; that whereas the value of the property was only $2200 on August 16, 1924, appellants agreed to pay $4000; that the contract is not unenforcible for want of mutuality because it amounted to an option in appellants; and that appellants did not employ Orloff, and Orloff was not the agent of appellants because Rosenthal, with whom he worked, was only an agent of appellants and had no authority to employ subagents.

The demand for specific performance is addressed to the conscience of the chancellor. The doctrine that specific performance of a contract to convey real estate is ordinarily as much a matter of course as an action of damages for its breach is subject to the qualification, which always applies in equity, that the contract was fairly and understandingly entered into, without any circumstances of misrepresentation, misapprehension or mistake which would make its enforcement oppressive or unjust. (*Keating* v. *Frint,* 291 Ill. 423.) Whether or not specific performance shall be granted is to be determined from all the facts and circumstances of the particular case. (*Wolf* v. *Lawrence,* 276 Ill. 11.) If the contract is unreasonable or unjust, or for any other good reason should not be enforced, a decree will not be granted. (*Dreiske* v. *Eisendrath Co.* 214 Ill. 199.) Courts may be prevented or deterred from decree-

ing specific performance of a valid and binding contract by circumstances and contingencies connected with its subject matter, its terms, or the relations of its parties to each other or with third persons, which would not constitute the slightest obstacle or objection to the recovery of a judgment for damages in courts of law. (Pomeroy's Specific Perf. of Contracts,—3d ed.—sec. 4; *Sugar* v. *Froehlich,* 229 Ill. 397; *Friend* v. *Lamb,* 152 Pa. 529.) As the court said in *Willard* v. *Tayloe,* 8. Wall. 557: "It is not sufficient, as shown by the cases cited, to call forth the equitable interposition of the court, that the legal obligation under the contract to do the specific thing desired may be perfect." The complainant who seeks specific performance "must stand before the court prepared to meet its scrutiny without a blush, relying upon the advocacy of a well regulated conscience in his favor." (*Stone* v. *Pratt,* 25 Ill. 25.) The discretion exercised by the chancellor in denying specific performance is subject to review only in case of abuse thereof. *Carver* v. *VanArsdale,* 312 Ill. 220.

There are obvious considerations which cloud decisively appellants' present demand for equitable intervention in their behalf. Orloff represented Isadore and Paulina Schwartz. He made a deal to split with Rosenthal, a member of the firm of Terwilliger & Co., the commission which he was to receive from the Schwartzes. This was only part of the story. Unknown to his original principals, Orloff had his other hand also extended for commission money, and he received reward from a source which, under the form that the deal necessarily took with appellants concealing their identity, was as directly adverse to the interests of his principals, against whom this suit is brought, as it would have been had he been paid by appellants themselves. The position in which he thus placed himself has been strongly condemned by many courts, and neither it nor the contract which was brought into being through his activities can be supported. The relation existing between a princi-

pal and agent for the sale of property is a fiduciary one, and the agent, in the exercise of good faith, is bound to keep his principal informed of all matters which come to his knowledge pertaining to the subject matter of the agency. (*Rieger* v. *Brandt,* 329 Ill. 21.) The rule is that the principal has a right to assume when he employs an agent, unless he is advised to the contrary, that the agent is in a situation to give to his principal that undivided allegiance and loyalty which the proper performance of the agency requires and that he will remain in that situation. If, without the knowledge and consent of his principal, the agent becomes the agent of the opposite party as well and undertakes by contract to bind his original principal, the law deems the original principal in that transaction to be practically unrepresented, and any bargain in his name or act done on his account is usually voidable at his option. The principal need not show himself injured, and his right to repudiate the transaction is not affected even by the good faith of the opposite party. Mechem on Agency, (2d ed.) secs. 1206, 2138; *Adams* v. *Larson,* 279 Ill. 268; *Gordon* v. *Beck,* 196 Cal. 768, 239 Pac. 309; *Napier* v. *Adams,* 143 S. E. (Ga.) 566; *Everhart* v. *Searle,* 71 Pa. 256.

As to the basis upon which this rule rests, after stating that it makes no difference that the principal was not, in fact, injured, or that the agent intended no wrong, or that the other party acted in good faith, the court in the *Napier case, supra,* said: "This doctrine is based upon the ground that the double agency is a fraud upon the principal, and that by reason of the fraud he is not bound by any transaction entered into with the other party." In the *Gordon case, supra,* the court said: "In such cases the personal and selfish interest of the agent is opposed to the interest of both principals. His concern is to see that the transaction is consummated in order to obtain his double commission. * * * It is immaterial that these results may not necessarily follow. It is enough that they are likely to follow.

It is the policy of the law not to permit an agent to assume a position that will result in such a strain on his honesty. The protection of the public against such duplicity is the foundation for the rule." The views of this court with reference to an agent taking commission from two masters were expressed in *Warrick* v. *Smith,* 137 Ill. 504, where one Johnson was an agent who undertook, for a commission, to sell Smith's land, and upon closing a contract with Warrick as purchaser Warrick paid Johnson $100. This court said: "It was improper for Johnson to accept money from Warrick while he was acting as Smith's agent. The same man cannot act at the same time as agent for both seller and buyer. His duty to the one is inconsistent with his duty to the other."

It is apparent, upon consideration, that the rule that the principal is not bound by a contract brought about by an agent who is secretly working for compensation from the other side is based upon a policy of law which recognizes the inherent necessity for keeping a close rein upon the activities of those who are in position to be tempted to abuse the confidence reposed in them as fiduciaries. It strikes directly at the potential fraud and double-dealing which an unscrupulous agent may perpetrate against the one whose interests he is supposed to guard with the fullest measure of zeal and honesty. While it necessarily presupposes the participation of an opposite party whose interests are adverse to those of the agent's original principal, to say that its application is absolutely dependent upon whether the party who seeks to take advantage of the agent's action was or was not, in the full sense of the law of agency, also a technical principal of such agent, would be to introduce an emphasis which neither has nor deserves any place whatever in its statement, and the result of which would be to recognize the form above the substance. The peculiar vice of the situation in which the agent secretly works in anticipation of a commission from a party other than his origi-

nal principal is well brought out by saying that the original principal in the transaction is thereby, in the words of Professor Mechem, "practically unrepresented." The emphasis is concentrated upon the potential wrong to him. To accept the contention of appellants would be to sanction the workings of a means whereby the salutary purpose of the rule could be frustrated with impunity. Certainly the present case is not one which calls for any such result. A court of chancery cannot undertake to enforce this contract, brought about by an agent who received reward from a source directly hostile to his principals' interests.

So far as the abstract shows, the chancellor made no special findings of fact. In the certificate of evidence is an oral statement made by him at the time he entered the decree. Appellants insist that it is apparent from this statement that the chancellor decided the case upon questions of law, only, and did not decide against appellants upon the merits, although there had been a full hearing thereon. From this premise appellants argue, in effect, that unless the expressed theories of the chancellor be sustained he cannot be held to have duly exercised his discretion in this case. Where the chancellor reaches a correct conclusion in dismissing a bill for want of equity it can make no difference what led him to such conclusion. (*Morse* v. *Seibold,* 147 Ill. 318.) It is the decree, and not the statement of the chancellor, which is before us for review. Error can not be assigned on the statement and its import is of no determining force here. Appellees have the right to sustain this decree upon any facts in the record, whether the reasons given in the chancellor's statement are good or not. (*Pelouze* v. *Slaughter,* 241 Ill. 215; *Froehlich* v. *Minwegen,* 304 id. 462.) Moreover, a decree for the defendant needs no evidence to support it, and it must stand unless it affirmatively appears that there was evidence adduced by the complainant or heard at the trial which entitled him to the relief prayed for in the bill. (*Ryan* v. *Sanford,*

133 Ill. 291.) It cannot be said that appellants made an affirmative showing entitling them to the relief prayed for, and there is no sufficient ground for disturbing the decree.

The decree of the circuit court of Cook county is therefore affirmed.

Per CURIAM: The foregoing opinion reported by Mr. Commissioner Edmunds is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.

*Decree affirmed.*