(No. 21259.—

MARY LERK, Plaintiff in Error, *vs.* GEORGE W. McCABE *et al.*—(THE CHICAGO TRUST COMPANY, Receiver, Defendant in Error.)

*Opinion filed June 24, 1932—Rehearing denied October 7, 1932.*

Joseph G. Sheldon, for plaintiff in error.

Kirkland, Fleming, Green & Martin, (William Wilson, William H. Symmes, and Keith Masters, of counsel,) for defendant in error.

Mr. Chief Justice Heard delivered the opinion of the court:

Plaintiff in error, Mary Lerk, (hereinafter called complainant,) filed her bill in the superior court of Cook county asking for the return of $20,000 and a $10,000 trust deed and notes given by her for the purchase of the Bel-Pine Apartments, located at 456-460 Belmont avenue, Chicago.

Subsequently one of the defendants, the Lake View State Bank, became insolvent and the Chicago Trust Company was appointed receiver. George W. McCabe, also a defendant, died after suit was started and his executors were substituted as parties defendant. The cause was referred to a master, who took evidence and filed his report recommending that complainant be granted the relief sought. The report was approved by the court and a decree entered accordingly. The Chicago Trust Company, as receiver, appealed to the Appellate Court for the First District. That court reversed the decree of the superior court of Cook county and remanded the cause to that court with directions to dismiss the bill for want of equity. The cause is here by leave of this court on *certiorari*.

The gist of complainant's bill is that she was misled into buying the Bel-Pine Apartments, to her hurt, by the defendant McCabe, president of the Lake View State Bank, and certain of its officers with whom there was a fiduciary relationship, whereby she depended upon their representations, which subsequently proved to be contrary to the facts. The bill alleges as grounds for the relief sought (1) that complainant was misled into paying $125,000 for the Bel-Pine Apartments, which were worth some $30,000 less than this amount; (2) that defendants falsely represented that there was a thirteen-year lease of the premises at a rental of $1250 a month; (3) that McCabe, then president of the Lake View State Bank, and the bank, guaranteed complainant an income of $250 a month net; (4) that McCabe, without authority from complainant, had included in the warranty deed whereby she acquired title, a clause assuming a mortgage of $90,000, which was then a lien on the property; and (5) a fiduciary relationship subsisted at the time of the transaction in question between complainant and these defendants and a breach of such trust.

The evidence shows that McCabe had been for many years intimate with James E. O'Boyle, the father of com-

plainant. In September, 1919, complainant was declared mentally incompetent and her father and McCabe were appointed conservators of her estate. In July, 1922, while she was still under the conservatorship of McCabe, her father executed his last will and testament, in which the Lake View State Bank, McCabe and James P. O'Boyle were appointed executors and trustees. All of his property, valued at approximately $150,000, was left to the executors, as trustees. The beneficiaries were a sister, who was given certain monthly allowances during her life, and the testator's three children, of whom complainant was one, shared in the estate equally, except for a 280-acre farm in Iowa which was left to complainant alone. No distribution was to be made for ten years after the death of the testator, which occurred in September, 1922. The Lake View State Bank was designated as depository for the trust funds of the estate. McCabe and the bank accepted the appointments and acted jointly with O'Boyle as trustees during the entire time the instant transaction occurred. In November, 1922, an order was entered finding that complainant was restored to her reason. She was a depositor in the Lake View State Bank. During the time of the transaction here in question she lived in California with her husband, and McCabe and other officers of the bank acted as her agents in the transaction.

Defendant in error argues that while the evidence shows that a fiduciary relationship existed at one time it terminated in 1922 and that it did not exist at the time of this transaction. The master who heard the evidence, the chancellor who heard the cause, and the Appellate Court, all concurred in finding adversely to defendant in error upon this contention, and they were fully justified by the evidence in so finding.

Prior to 1926 the Bel-Pine Apartments had been owned by Agnes G. McLaughlin and her husband and they were heavily indebted to the Lake View State Bank. A building corporation was formed, called the Bel-Pine Building Cor-

poration, which on February 24, 1925, acquired title to the premises from the McLaughlins, and all the capital stock of the corporation except one share was owned by Mrs. McLaughlin and her husband. In June, 1926, the Bel-Pine Building Corporation executed its note, secured by trust deed conveying the premises, in the sum of $40,000, which trust deed was subject to three prior trust deeds on the property securing an aggregate indebtedness of $99,000. All the capital stock of the corporation was transferred to Catherine G. McCabe, (a daughter of George W. McCabe, president of the bank,) O. D. Granstrand, assistant cashier of the bank, and Richard F. Hickey, an employee of the bank, and these bank officials were elected directors of the building corporation. The shares of stock in the building corporation were held by the bank as collateral security for the payment of a note of the McLaughlins. At the same time a written agreement was entered into between the McLaughlins and Frank J. O'Donnell, a real estate broker, that in the event of a sale of the premises the net proceeds should be applied on the indebtedness of the McLaughlins to the Lake View State Bank.

In the Fall of 1925 complainant sold a flat-building which she then owned in what was formerly known as Lake View, for $50,000, which she deposited in the Lake View State Bank. Shortly thereafter she was called upon by O'Donnell, the real estate man, who sought to interest her in properties for the sale of which he was the agent. To gain her favorable consideration, at their first meeting he gave her the personal card of McCabe, with the following written on the reverse side: "Mrs. Mary Lerk—Introducing Mr. Frank O'Donnell, an honest real estate man.— George W. McCabe." During their negotiations O'Donnell took complainant to see the Bel-Pine Apartments, of which she made a cursory examination. The negotiations between O'Donnell and complainant proceeded to the extent that a tentative agreement for sale was entered into, complainant

depositing a check for $30,000 with the Lake View State Bank as part payment on the purchase. The reason the deal did not go through, as testified to by O'Donnell, was "because the Bel-Pine Building Corporation could not make title to the premises. There were a large number of judgments, mechanics' liens and creditors' bills," and "we were unable at that time to accumulate enough money by refinancing the building and using the money Mrs. Lerk agreed to put in, to discharge creditors' bills, judgments and mortgages which were accumulated against the property."

In October, 1926, Granstrand, the assistant cashier of the bank, was in Los Angeles and had an interview with complainant at her home. As the result of their conference, after his arrival in Chicago Granstrand on October 28, 1926, wired complainant as follows: "Will you make offer we suggested. Mr. McCabe says O. K. Should not be delayed." On October 30, 1926, complainant wired McCabe as follows: "Received Mr. Granstrand wire make owner offer one hundred twelve thousand the buildings are pretty old and the lease may not run 14 years it only pays me above $165 a month net if he accepts our offer we will close the deal at once please send me an itemized statement of all expenses all about the lease and taxes & interest." On October 30, 1926, McCabe wired complainant: "Can not buy Belmont avenue building for less than one hundred twenty-five thousand think it a fine proposition for you as property is steadily advancing will finance it to leave you two hundred fifty dollars per month must have your answer Monday." On November 5, 1926, he again wired her: "Your telegram received Belmont avenue seventy-five feet forty-two apartments seven three-rooms property is same price as last year one hundred twenty thousand dollars and five thousand paid on lease is taken off last year of lease rent a first mortgage of ninety thousand six per cent will be arranged five or seven years no expense to you payments two hundred each month you give a second

of ten thousand pay two hundred each month you pay twenty thousand cash send a New York draft to this bank for twenty thousand bank will hold all money until good title and possession is turned over to you rent is fifteen thousand each year for thirteen years payable each month tenant owns furniture Mrs. Gleason considered good tenant I have agreed to make deal and will sign for you on receipt of your telegram answering this wire at once later on if necessary we would help you this deal would leave you two hundred fifty per month."

On November 8, 1926, complainant wrote McCabe as follows: "Enclosed find $20,000, the amount required for deposit on Belmont ave. property. I also wired Mr. Charles to look over all papers. I am trusting to you, Mr. McCabe, to see if there is any special assessment on the street, as the way I understand it is clear. Please make that $90,000 first mortgage for seven years instead of five years, or as long as possible. Let me know when you think the deal will close. Don't let Mr. Charles delay it too long, as I would like my income to start as soon as possible. Thanking you and Mr. Granstrand for your personal interest.— P. S. Don't fail to put deed and all papers Mary Lerk name."

Albert N. Charles, an attorney who had represented complainant on various occasions, testified: "I had a talk with George W. McCabe in his lifetime pertaining to this property. I had one talk with him about November 1, 1926, by telephone. He called me. I recognized his voice. Mr. McCabe said, 'The Bel-Pine building is a wonderful buy for Mrs. Lerk. I recommend her to buy it. I want you to wire her recommending it.' He said if she bought it she would have $250 net a month, and besides that, out of the rents she could pay all the principal and interest and carrying charges and that he would finance the proposition for her. After I had this talk with McCabe I wired Mrs. Lerk. This is the wire that I sent: 'Telegram received. Mr. McCabe recommends highly your purchasing

Belmont avenue property. I will look after legal details for you.' " The wire is marked "Complainant's Exhibit 10."

On November 15, 1926, the Bel-Pine Building Corporation, by Richard F. Hickey, its president, and Catherine G. McCabe, its secretary, executed and delivered its trust deed to the Chicago Title and Trust Company as trustee, covering the premises in question, which trust deed was on November 30, 1926, filed for record in the recorder's office of Cook county. This trust deed was executed to secure the payment of an indebtedness of the Bel-Pine Building Corporation in the aggregate sum of $90,000, evidenced by 180 bonds in the sum of $500 each, 140 falling due November 15, 1933, five on November 15, 1927, five on November 15, 1928, five on November 15, 1929, five on November 15, 1930, five on November 15, 1931, five on November 15, 1932, and ten on November 15, 1933, each bearing interest at the rate of six per cent per annum, payable semi-annually.

On December 21, 1926, Theodore Johnson, the attorney who had represented the bank and the Bel-Pine Building Corporation throughout all their transactions, wrote complainant as follows: "Mr. George W. McCabe has requested me to send you the enclosed notes and trust deed for execution. The notes should be signed by you, and the trust deed should be signed by you and Mr. Lerk and acknowledged before a notary public having a seal. Will you please execute and return the notes and trust deed to the Lake View State Bank by aeroplane mail, inasmuch as there has been a considerable delay in closing this matter up, so that we can close it up next week; and will you also please write the Lake View State Bank or Mr. George W. McCabe advising them that you are willing to leave the matter in their hands for closing, providing that your interests are fully protected." The enclosures in this letter were fifty principal promissory notes, numbered 1 to 50, dated December 16, 1926, each in the sum of $200, pay-

able to bearer at the Lake View State Bank, Chicago, with interest at six per cent per annum, and a second mortgage of the same date securing the fifty notes. The notes and trust deed were received by complainant and were signed by her, and the trust deed was executed by her and her husband on December 27, 1926, and the trust deed and notes were sent by her to Charles, who turned them over to McCabe. The trust deed was filed for record on December 30, 1926. On December 16, 1926, a warranty deed was made and executed by the Bel-Pine Building Corporation, by Richard F. Hickey; president, attested by Catherine G. McCabe, secretary, and bearing the corporate seal, conveying the premises to complainant and containing an assumption clause, and on December 30, 1926, was filed for record in the recorder's office of Cook county. The deed contained the following clause: "Subject to trust deed of record to Chicago Title and Trust Company bearing date November 15, 1926, and recorded as document No. 9480975, given to secure $90,000 and interest, which grantee assumes, and to all taxes and assessments levied after the year 1926." The deed was not shown either to complainant or Charles prior to its being placed on record.

The $20,000 cash paid by complainant and the proceeds of the second mortgage of $10,000 were disbursed by the Lake View State Bank as follows: To Harry R. Arthur and others on trust deed dated June 20, 1924, $11,464.75; to A. G. Duncan, who held claim against Bel-Pine Building Corporation, $226; redemption of premises from tax sale, $1787; Chicago Title and Trust Company for continuation of guaranty policy, recording, etc., $528.80; Theodore Johnson, attorney's fee, $200; Theodore Johnson, for disbursements by him, $11.25; balance to Lake View State Bank and credited by it on the indebtedness owing to it by Agnes G. McLaughlin, $15,782.20; total, $30,000.

The proceeds of the first mortgage of $90,000 were disbursed by attorney Daniel Healy, who represented certain

lienholders, as follows: Balance unpaid of bond of Agnes G. McLaughlin dated January 2, 1924, secured by trust deed to the Chicago Title and Trust Company, recorded as docket No. 8257650, $54,500; interest thereon from June 2, 1926, to November 15, 1926, $1308.76; balance of principal due Mrs. O'Neil on notes of John J. McLaughlin dated May 25, 1923, secured by trust deed to the Chicago Title and Trust Company, recorded as docket No. 7952507, $24,963.57; interest from July 2, 1926, to November 15, 1926, $563.36; brokerage commission for placing the $90,000 loan, $5400; premium for privilege of taking up the bonds secured by the trust deed dated January 2, 1924, docket No. 8257650, $1400; cost of printing new bonds, $144; Chicago Title and Trust Company for certifying bonds, $90; paid Lake View State Bank and credited by it to the indebtedness to it from Agnes G. McLaughlin, $1630.31; total amount first mortgage, $90,000.

From this statement it will be seen that out of all of the proceeds there was paid to the Lake View State Bank on account of the indebtedness due to it from Mrs. McLaughlin and the Bel-Pine Building Corporation the sum of $17,417.51. After the closing of the purchase of the premises by complainant she received from the Lake View State Bank four payments, each of $250, totaling $1000. The last payment was on April 19, 1927, accompanied by a letter from the bank to complainant, since which time neither the bank nor anyone else has paid her anything on account of rent or her interest in the premises.

The court in the decree found that Mrs. Gleason (referred to in the night letter as being a good tenant owning her own furniture) was not liable to complainant under a thirteen-year lease but was occupying the premises under a lease from Mrs. Minne Klawans, who was at one time a lessee under a fifteen-year lease jointly with Lillian Lew, both of whom had been fully released from the obligations of the lease by a rider attached thereto signed by Mrs. Mc-

Laughlin, dated April, 1925, and hence neither Mrs. Gleason, Mrs. Klawans nor Lillian Lew was legally liable to pay rent under the lease, and that while the furniture in the premises was owned by Mrs. Gleason, the same was in October, November and December, 1926, fully covered by a chattel mortgage to Mrs. Klawans.

Complainant not receiving any June, July or August rent or any satisfactory explanation by McCabe or the bank to her inquiries with reference thereto, returned to Chicago about September 16, 1927, and after investigation and ascertaining the facts with reference to the deal, on October 22, 1927, tendered to the bank and the Bel-Pine Building Corporation a quit-claim deed executed by herself and her husband re-conveying to the building corporation all of the interest acquired by complainant in the premises and a re-assignment of the lease, and demanded of the bank and the building corporation a return of the sum of $20,000 paid by her on or about November 15, 1926, less the sum of $1000 which had been received by her, together with interest at five per cent per annum, and requested them to cancel and return to her the fifty $200 notes executed by her and a release of the obligation, apparently assumed by her in the warranty deed, to pay the indebtedness of $90,000 secured by a prior trust deed on the premises, and the building corporation and the bank refused to accept the deed and assignment of the lease and to return the money and notes.

On or about November 15, 1927, default having been made in the payment of interest, etc., due on said date on bonds secured by the first mortgage on the premises, a bill of foreclosure was filed in the circuit court of Cook county by Katherine Healy O'Neil *et al. vs.* Mary Lerk *et al.,* wherein it was alleged that the complainant therein was owner and holder of certain bonds secured by the mortgage, alleged default and prayed for foreclosure of the mortgage. On November 30, 1927, by an order of court entered in

the cause, John Glenn was appointed receiver of the premises and qualified as such. On March 30, 1928, an order was entered in said cause authorizing the receiver to execute a lease to Milton J. Hargis for the premises from month to month at a monthly rental of $600. Further proceedings were had in the case, and on June 28, 1928, a decree was entered therein finding there was due the complainant therein the sum of $23,615.56 and interest thereon from June 15, 1928, and solicitors' fees, and foreclosing the mortgage. The premises were sold under the decree, and on July 26, 1928, the master who made the sale filed his report of sale and the distribution of the proceeds of such sale. Thus it will be seen that complainant lost her entire investment in the Bel-Pine Apartments, which were recommended as a wonderful buy for her.

It is to be noted that the $90,000 mortgage given in the re-financing of the corporation's financial affairs, the payment of which complainant was said to assume by the recital in the warranty deed made to her, did not conform to the description of the mortgage given by McCabe to complainant in his telegram of November 5, 1926. Neither did the deed conform to complainant's instructions to McCabe contained in her letter of November 8, 1926, as it is disclosed by the evidence that there were two unpaid special assessments which were a lien upon the land. While complainant and her attorney, Charles, knew that there was a $90,000 mortgage on the premises, neither of them was ever shown the lease, any of the papers with reference to the re-financing, or the warranty deed to her before it was recorded, and after it was recorded it was returned to the Lake View State Bank. The record does not show that at any time did McCabe, or the bank or any of its officials, or any of the agents or brokers, inform complainant of the interest which McCabe and the bank had in the Bel-Pine Apartments, or that they had any interest in the sale or its proceeds, or that she derived such knowledge from any

other source prior to the recording of the deed of the premises to her.

We have refrained from discussing or considering any of the evidence given by complainant in her own behalf, as prior to the trial McCabe had died and a substitution of parties had been made, and a specific objection was made to the competency of her testimony on the ground that the executors of his last will and testament were defending as such executors. Without passing upon the question (McCabe's representatives not having appealed) excluding her testimony, the evidence shows clearly and conclusively that during the entire time from the appointment of Mc-Cabe as a conservator for complainant's property until after June, 1927, a fiduciary relation existed between McCabe and complainant, and that during the time of the transaction in question such relation extended to the bank and its officers, and that in the transaction in question, McCabe, the bank, its officers, and attorney Johnson, were all acting as agents of complainant, and each and all of them owed her the several duties arising out of their relationship.

The relation of principal and agent is one of trust and confidence, and where such confidence is reposed and such relation exists it must be faithfully acted upon and preserved from any intermixture of imposition. The rule is the same no matter how large or how small the commission paid may be or whether the agent is a mere volunteer at a nominal consideration. (*Perry* v. *Engel,* 296 Ill. 549.) An agent acting for the purchaser of land, whether by appointment or as a volunteer, must see that he meets fairly and squarely the responsibility of his position and does not take any advantage, either for his own gain or to the injury of the person whom he represents. (*Salsbury* v. *Ware,* 183 Ill. 505.) The rule is well established in equity that the relation existing between principal and agent for the purchase or sale of property is a fiduciary one, and the agent in the exercise of good faith is bound to keep his

principal informed on all matters that may come to his knowledge pertaining to the subject matter of the agency. (*Reiger* v. *Brandt,* 329 Ill. 21.) An agent must not put himself, during the continuance of his agency, in a position adverse to that of his principal. To the latter belongs the exercise of all the skill, ability and industry of the agent. If a party employs an agent to make a purchase of land he is entitled to all the skill, ability and industry of such agent to make the purchase on the best terms that can be had. (*Cottom* v. *Holliday,* 59 Ill. 176.) An agent cannot deal' for his own advantage with the things purchased for his principal, or become a seller or buyer of them, because of his confidential relation and his duty to disclose to his principal every fact, circumstance or advantage in relation to the purchase which may come to his knowledge. (*McDonald* v. *Fithian,* 1 Gilm. 269; *Strong* v. *Lord,* 107 Ill. 25.) An agent cannot directly or indirectly acquire an interest in his principal's business without the principal's consent freely given and with full knowledge of every matter known to the agent which might in any way affect the principal's interest, and it is of no consequence that no fraud was intended or that no advantage was derived by the agent. (*Fox* v. *Simons,* 251 Ill. 316.) It is a settled rule in this State that transactions of parties between whom a fiduciary relation exists are *prima facie* voidable on grounds of public policy. They will be closely scrutinized by a court of equity, and relief will be granted unless the party claiming the benefit of the contract shows by clear and convincing proof that he has acted in perfect good faith and has not betrayed the confidence reposed in him. (*Thomas* v. *Whitney,* 186 Ill. 225; *Casey* v. *Casey,* 14 id. 112.) It is the confidential fiduciary relation existing between the parties which gives rise to such suspicion. If a reasonable suspicion exists that the confidence has been abused the contract will be set aside. (*Dowie* v. *Driscoll,* 203 Ill. 480; *Beach* v. *Wilton,* 244 id. 413.) And this though the contract is such that

had no fiduciary relation existed the contract would not be disturbed. (*Eichhorst* v. *Eichhorst,* 338 Ill. 185.) If, without the knowledge and consent of his principal, the agent becomes the agent of the opposite party as well and undertakes by contract to bind his original principal, the law deems the original principal in that transaction to be practically unrepresented, and any bargain in his name or any act done on his account is usually voidable at his option. The principal need not show himself injured, and his right to repudiate the transaction is not affected even by the good faith of the opposite party. (*Chicago Title and Trust Co.* v. *Schwartz,* 339 Ill. 184; *Adams* v. *Larson,* 279 id. 268.) In *Voorhees* v. *Campbell,* 275 Ill. 292, it is said: "Transactions between a party and one bearing a fiduciary relation to him are, upon motion of the defendant party, *prima facie* voidable upon grounds of public policy, and the fiduciary relation being established, the burden of proof is upon the one receiving the benefit to show an absence of undue influence by establishing such facts as will satisfy the court that the dealing was at arm's length, or that the transaction was had in the most perfect good faith and was equitable and just between the parties."

The evidence clearly shows that the sale of the Bel-Pine Apartments to complainant was greatly beneficial to McCabe and the Lake View State Bank and that it was not beneficial to her, but, on the contrary, was detrimental. One of complainant's points made in her bill is that McCabe and the Lake View State Bank did not inform her as to their interest in the transaction.

When we apply the rules of law above stated to the facts in this case it seems clear that the superior court was fully justified in entering its decree, and it is affirmed. The judgment of the Appellate Court is reversed.

> *Judgment of Appellate Court reversed.*
> *Decree of superior court affirmed.*