(No. 35720.—

MARGARET K. MOEHLING, Appellee, *vs.* W. E. O'NEIL
CONSTRUCTION Co., Appellant.

*Opinion filed September 29, 1960.—Rehearing denied Nov. 30, 1960.*

Mitchell & Conway, of Chicago, (William I. Conway, Thomas J. Russell, and Robert J. Di Leonardi, of counsel,) for appellant.

Sturman & Bloch, of Chicago, for appellee.

Mr. Justice Bristow delivered the opinion of the court:

Plaintiff, Margaret K. Moehling, brought this suit in the superior court of Cook County against the W. E. O'Neil Construction Company, defendant, seeking specific performance of an alleged oral agreement relating to the conveyance of ten acres of land. The cause was referred to a master, who found the issues for plaintiff, and this direct appeal is prosecuted by defendant from an ensuing decree for specific performance. A freehold is involved to give us jurisdiction. *Lang* v. *Parks,* 19 Ill.2d 223.

Late in January, 1957, defendant, a general construction company, needed acreage for road-fill purposes in connection with the performance of Illinois toll road contracts. It engaged the Ben F. Eidamiller Company, real-estate brokers, to help acquire land for such purpose, and plaintiff, a licensed saleswoman for the Eidamiller firm, was assigned to this duty. She exhibited to Anthony DeSimon, engineer and construction superintendent for defendant, various plats and listings, including two properties known as the Conrad

Wille and Arnold Wille farms, the former consisting of about 62 acres and the latter of about 39 acres. According to plaintiff, DeSimon advised her that the western portion of the Arnold Wille farm was unsuitable because bordering roadways would create traffic problems, because excavations for fill could not be made within 300 feet of the roadways, and because that part of the land was low. After it was ascertained that Arnold Wille was interested only in selling the entire farm, DeSimon was advised of such fact on February 10, 1957, and it is plaintiff's theory that, on such date, it was orally agreed between them that she would obtain an option to purchase the entire farm, she to acquire the west ten acres for herself and defendant the remainder of the property, each contributing proportionately to the purchase price. Further, it is her theory that the oral agreement with DeSimon was orally ratified the following day by William E. O'Neil, treasurer of defendant, and that it was later evidenced by memoranda sufficient to satisfy the Statute of Frauds. For the defendant, it is contended that the oral agreement was not proved by the clear and convincing evidence required, or that, if proved, the agreement is unenforceable under the Statute of Frauds, and that plaintiff is barred from recovery because she breached the fiduciary relationship existing between the parties.

Detailing the conversation of February 10, 1957, when the oral agreement was purportedly entered into, plaintiff testified she told DeSimon that she and her husband had talked over the proposition and felt they would be interested in the western portion of the Arnold Willie farm, and that when she asked if "we would have a deal if we took the west ten acres," DeSimon replied in the affirmative, stating: "I feel my people would go along with that." DeSimon, who pointed out that he did not have final authority for land purchases by his company, denied having such a conversation, and testified he never knew but what his company was to get the entire farm.

Concerning the alleged ratification by William E. O'Neil on the following day, plaintiff testified that DeSimon said to O'Neil in her presence: "Mrs. Moehling is interested in the west ten acres and what if she disposes of that part?" and that O'Neil replied: "Fine, that's swell." The latter, however, denied having made any agreement with plaintiff, or that he had any conversation with her relative to her purchase of the west ten acres.

On February 15, 1957, plaintiff was given two checks by defendant, each in the amount of $2,500 and payable to Eidamiller Company, to be used, respectively, as deposits toward the purchase of both the Arnold and Conrad Wille farms. With respect to the latter farm, the sale of which is not in issue, the record shows that defendant ultimately purchased it for $2,500 an acre at a meeting arranged by plaintiff, and that defendant likewise paid to Eidamiller a brokerage fee of 5 per cent, or $125 an acre, a portion of which was passed on to plaintiff as her sales commission.

A completely different course was pursued with respect to the Arnold Wille farm. As to it, plaintiff deposited the $2,500 check with her employer and drew a firm check in the same amount, which was used, on February 18, 1957, to obtain an option in her own name for the purchase of the farm. Although it was the testimony of defendant's witnesses that the option was taken in plaintiff's name without defendant's knowledge or authority, plaintiff's version was that it was done upon defendant's instructions as a device to conceal the true identity of the purchaser, thus keeping the price down and hiding from the seller the fact that his land was going to be excavated and used for road fill. Plaintiff testified she told Arnold Wille there were going to be two purchasers of his land. Wille, however, denied he had been told this and stated plaintiff had declined to tell him who the purchaser was going to be.

The option in question was originally prepared by Harry Talcott, an attorney for Eidamiller, but was corrected and

redrafted by Peter Struck, Wille's attorney, at a meeting between Struck and the plaintiff. At no time, however, was the option agreement shown to defendant before it was submitted to Wille and signed. Indeed, as shall be later pointed out, it was not until March 14, 1957, over a month later, that defendant was shown the option agreement. By its terms, plaintiff or her assigns were given an option to purchase about 39 acres, (the exact acreage to be determined by a survey furnished by plaintiff,) at a price of $3,500 an acre, on or before May 17, 1957. If the option was not exercised by such date the deposit of $2,500 was to be forfeited. In addition, it provided for payment of the purchase price in three yearly installments, beginning May 17, 1957, and concluding May 17, 1959, and, inconsistent with defendant's needs and purposes, prohibited the removal of soil from the premises until the purchase price of approximately $136,000 had been paid in full. Still another provision bound Wille to pay plaintiff a broker's commission of 5 per cent on the total sale price. In retrospect, it appears that plaintiff was acting for both the buyer and the seller, and herself as well.

Plaintiff testified she told DeSimon about the option and discussed its terms with him on the following day, February 19, 1957, but he denied that this was so, or that he even knew at that time that an option had been obtained. None of defendant's officers or agents were shown the option until March 14, 1957, when plaintiff delivered a copy to John Breen, defendant's attorney, after what he described as repeated requests. In explaining this circumstance, plaintiff testified simply that none of defendant's representatives had ever asked to see the option.

The next event of consequence after the execution of the Wille option occurred on February 28, 1957, when plaintiff mentioned to Robert O. Wall, defendant's project manager, that part of the land was to become hers and was told by him it looked as if defendant would need the

entire farm. She testified this news caused her to fear there might be some dispute as to the ten acres, so she went to Talcott on March 1, 1957, who drafted a memorandum for her as follows:

"To: Margaret K. Moehling

With reference to the option given to you by Arnold Wille and Frances Wille, his wife, and Ida Wille, a widow, dated February 18, 1957, wherein you have the privilege and option of purchasing on or before May 17, 1957, the following described premises, situated in the Township of Elk Grove, County of Cook and State of Illinois, to-wit:

The 39 acres more or less on the south east corner of Oakton Street and Elmhurst Road commonly known as the John Wille farm, also known as the Arnold Wille farm, including the buildings known as the John Wille homestead, except part taken for toll road

at the price of $3,500.00 per acre, the area to be determined by survey, we are interested only in that part of said premises above mentioned which lies directly north of and adjacent to the premises known as the Fritz Wille farm, the rest of the above premises described in and covered by the option given you by Arnold Wille and Frances Wille, his wife, and Ida Wille, a widow above referred to, you are to dispose of in any manner you see fit, we have no interest in it.

Dated this first day of March, 1957."

Thereafter, plaintiff took the memorandum to defendant's field office where it was signed by Arthur O'Neil, defendant's president, and attested by Wall. The circumstances surrounding this occasion are in dispute. Plaintiff testified that Arthur signed after being assured by both DeSimon and William E. O'Neil, (Arthur's father who was contacted by telephone,) that she had a deal to purchase the west ten acres. Arthur, however, testified he refused to sign the paper, but finally did so under protest after telephoning his father and after plaintiff had told him that if he didn't sign his company would have nothing since the option to purchase was in her name. Wall corroborated Arthur but plaintiff denied making any coercive statements. William E. O'Neill acknowledged that he had received a telephone call from his son on the date in question, but did

not elaborate on the substance of their conversation, and testified he had never had either a conversation or agreement with plaintiff whereby she was to pay for the west ten acres and obtain a conveyance for herself.

Sometime after the memorandum of March 1, 1957, was executed, it was discovered that the land described therein as "the rest of said premises," actually consisted of twenty acres, instead of ten acres as the parties had believed. Testifying with respect to this discovery, plaintiff stated that, at defendant's request, she had attempted to sell the 20 acres but was unable to do so. Arthur O'Neil, in telling of a conversation he had with plaintiff in late March or early April, 1957, stated he inquired of plaintiff as to whether any disposition of the twenty acres had been made, and was told that the party interested in the twenty acres was now only interested in the west ten, and that she doubted if anybody would be interested in the middle ten acres.

On April 8, 1957, plaintiff assigned the Wille option to defendant and delivered it to Breen at a meeting the latter had arranged in the office of attorney Talcott. The assignment was witnessed by Talcott and although plaintiff first testified she was representing both Eidamiller and herself at the meeting, it was her later testimony that she had no personal attorney and that Talcott was acting only for Eidamiller. Detailing the events of this meeting, plaintiff testified she first executed an assignment of the Wille option as requested, then asked Breen about her ten acres, whereupon he wrote and signed the following statement on back of the memorandum she had procured from Arthur O'Neil on March 1, 1957:

April 8, 1957
"If and when, W. E. O'Neil Construction Co., are the owners in fee simple of the real estate described as follows:
The North ½ of the North ½ of Northwest ¼ of Section 25, Township 41, North, Range 11, East of 3rd P.M.,
it or its nominee will cause an option to be given to Margaret K. Moehling or her assign, for the purchase of the west ten (10)

acres thereof, at a purchase price of $3,500 per acre, net to W. E. O'Neil Construction Co., said option to be exercised on or before May 17, 1957.

> W. E. O'Neil Const. Co.,
> by /s/ John A. Breen,
> Its Attorney."

Breen's version of the circumstances attending the execution of this statement was materially different. He testified plaintiff stated she would not assign the Wille option to defendant unless and until she was given in return an option to purchase the west ten acres. At this, according to Breen, he prepared the statement and signed it after it had been examined by both plaintiff and Talcott, following which plaintiff then signed the Wille option. Talcott did not testify in the cause but plaintiff denied that the statement had been shown to him.

After obtaining the assignment of the Wille option, Breen and the Wille attorney, Peter Struck, met on May 10, 1957, and worked out a new agreement, the purpose of which was to permit defendant to remove soil immediately, whereby the land was divided into two parcels and defendant was authorized to take possession and remove soil from parcel 1 on payment of about one half of the purchase price of the entire tract. The west ten acres was a part of parcel 1, and it clearly appears that defendant did not in fact remove any soil from that part of the land. Noteworthy, too, is plaintiff's testimony that she had shown Breen's written statement of April 8, 1957, to Struck, and the latter's denial that this was so, or that plaintiff had ever told him she had an interest in the property.

Subsequently, on May 20, 1957, Wille conveyed parcel 1 to a trustee under a land trust and, on July 18, 1957, delivered a check to plaintiff, payable to Eidamiller, representing 5 per cent of the purchase price he had received. Parcel 2 was apparently conveyed and paid for in June, 1958, for in July of that year Wille delivered another check to Eidamiller representing 5 per cent of the balance

of the total purchase price. Plaintiff, in turn, received her regular sales commissions from the brokerage fees Wille had paid.

The events occurring between plaintiff and defendant following her assigment of the Wille option are also in some conflict. Plaintiff testified she talked to Arthur O'Neil on May 2, 1957, and advised him she had obtained a loan and was ready and waiting for the ten acres, but was told that defendant was not ready to act and that she would be notified. She also related that she called Breen on May 11, who told her defendant had purchased the 20 acres outright and that she would have to talk to Arthur O'Neil about the ten acres. O'Neil, she said, pleaded that he was too busy and put her off during several telephone conversations but, finally, on May 15, agreed to arrange a meeting for May 21, overruling plaintiff's objection that her option would then have expired by saying "a few days more wouldn't make any difference." When he had not called to arrange a meeting by noon of May 20, plaintiff called O'Neil, with Charles A. Hodlmair her immediate superior in the Eidamiller firm on another extension, and, according to both, she was told by O'Neil that she was not going to get the ten acres.

O'Neil testified that plaintiff telephoned him on or about May 13, 1957, saying she had a loan and was ready to take up her option, but he told her he wanted to talk to Hodlmair or some other principal of the Eidamiller firm and pointed out that May 17 would soon come around. He thought she promised that Hodlmair would call, and testified that although he was available during the following week, it was not until May 21 or 22 that he received a call. When Hodlmair inquired if plaintiff's option could be taken up, the witness told him plaintiff's right to the ten acres had expired.

Upon the basis of the facts related, the master found that the parties had entered into an oral agreement on Feb-

ruary 10, 1957, whereby it was agreed that plaintiff was to purchase the west ten acres for herself; that the memorandum dated March 1, 1957, was evidence of the oral agreement and constituted an option agreement binding on the parties; that the oral agreement, together with the memorandum, did not violate the Statute of Frauds; and that plaintiff had not been guilty of fraud, undue influence or breach of a fiduciary relationship. He recommended that defendant be ordered to convey the west ten acres to plaintiff upon the latter's payment of $35,000 and, after objections and exceptions to his report had been disposed of, such a decree was entered.

This court has held on countless occasions that to justify a decree of specific performance of an oral contract to convey or devise real estate, the proof of the contract must be clear, conclusive and so convincing as to leave no doubt in the mind of the court and it must be made to appear that the terms of the contract are certain, definite and unequivocal. (*Pope* v. *Speiser,* 7 Ill.2d 231; *Greenwood* v. *Commercial National Bank of Peoria,* 7 Ill.2d 436; *Ellis* v. *Williams,* 414 Ill. 99; *Lonergan* v. *Daily,* 266 Ill. 189.) And while, in the present case, an analysis of the entire record leaves us far from satisfied that proof of the oral contract claimed meets these requirements, it is enough to say that, even if properly proved, the contract is void for lack of consideration and, because of the fiduciary relation existing between the parties, is unenforceable by plaintiff as a matter of public policy.

One of the essential requirements of law for the formation of a contract is a valid consideration, the general rule being that consideration must flow from both parties, (*Corbett* v. *Cronkhite,* 239 Ill. 9,) and it is likewise elementary that an executory contract without consideration cannot be enforced either in a court of law or one of equity. (*Heartt* v. *Sherman,* 229 Ill. 581; *McLean* v. *McBean,* 74 Ill. 134; see also: Restatement of Contracts, secs. 19

and 75.) To meet this requirement in the instant case, it is plaintiff's claim that the consideration flowing from her for the alleged oral contract was her procurement of the Wille option and its later assignment to defendant. Such an argument, however, overlooks that plaintiff was in fact employed as an agent to procure land for defendant, that she obtained the Wille option with funds furnished by defendant and expended no monies of her own, and that she at no time bound herself in any manner to purchase the property. In short, plaintiff performed no act and rendered no service to defendant with respect to the Wille land other than what she was already required and obligated to do by reason of the legal relationship of principal and agent existing between them. The law is well settled that a promise to do something one is already obligated to do is no consideration and creates no new obligation. (See: *Macks v. Macks,* 329 Ill. App. 144; *Plain* v. *Golden,* 334 Ill. App. 264; 17 C.J.S., Contracts, sec. 112.) When we consider, too, that plaintiff was paid a full commission by the seller as a result of the purchase of the land by her principal, it is apparent that she furnished no consideration for the alleged oral agreement such as would result in a binding and enforceable contract.

Moreover, the fiduciary relation existing between the parties brings into focus still another reason why, under the facts in evidence, equitable relief of specific performance must be denied in this case. It has long been the settled law in this jurisdiction that transactions of parties between whom a fiduciary relationship exists are *prima facie* voidable on the grounds of public policy. (*Hagerman* v. *Schulte,* 349 Ill. 11; *Burrows* v. *Palmer,* 10 Ill.2d 344.) But, at the same time, the mere existence of a fiduciary relationship does not invalidate a transaction between the parties where the evidence discloses that the contract was fair, open and honest. (*Masterson* v. *Wall,* 365 Ill. 102; *McFail* v. *Braden,* 19 Ill.2d 108.) Where, however, a reasonable suspicion

exists that the confidential relation has been abused, the contract or transaction will be set aside, even though it is such that it would not be disturbed had no fiduciary relation existed. *Lerk* v. *McCabe,* 349 Ill. 348; *Eichhorst* v. *Eichhorst,* 338 Ill. 185.

The relation existing between principal and agent for the sale or purchase of property is a fiduciary one, (*Mortell* v. *Beckman,* 16 Ill.2d 209,) whereby the agent sustains a position of trust toward his principal, and in all his transactions affecting the subject of his agency the law dictates he must act in utmost good faith and must make known to his principal all material facts within his knowledge which in any way affect the transaction and the subject matter of his agency. (*Lerk* v. *McCabe,* 349 Ill. 348; *Blanchard* v. *Lewis,* 414 Ill. 515; also see: 1 I.L.P., Agency, secs. 59-66.) And where, as here, it appears that the agent sought to deal with the principal on her own account, the same good faith and disclosure of material facts are required. Representing the Illinois and majority view, it is observed in the Restatement of Agency: "One employed as agent violates no duty to the principal by acting for his own benefit if he makes a full disclosure of the facts to an acquiescent principal and takes no unfair advantage of him. Before dealing with the principal on his own account, however, an agent has a duty, not only to make no misstatements of fact, but also to disclose to the principal all material facts fully and completely. A fact is material within the meaning of the rule stated in this Section if it is one which the agent should realize would be likely to affect the judgment of the principal in giving his consent to the agent to enter into the particular transaction on the specified terms. Hence, the disclosure must include not only the fact that the agent is acting on his own account (see § 389), but also all other facts which he should realize have or are likely to have a bearing upon the desirability of the transaction from the viewpoint of the principal.

This includes, in the case of sales to him by the principal, not only the price which can be obtained, but also all facts affecting the desirability of sale, such as the likelihood of a higher price being obtained later, the possibilities of dealing with the property in another way, and all other matters which a disinterested and skillful agent advising the principal would think reasonably relevant." Restatement of Agency, sec. 390, Comment a.

When plaintiff's conduct is appraised in the light of these common-place principles controlling the relation of principal and agent, it is our opinion she placed herself beyond the pale of equitable relief. While many incidents create suspicion that plaintiff violated her fiduciary obligations, the one which serves to demonstrate most vividly that she abandoned the interests of her principal in favor of her own is that relating to the procurement of the Wille option. The scope and purpose of plaintiff's agency was to obtain acreage to be used for road-fill purposes. Defendant's need was immediate and demanding. Yet, we find plaintiff procured an option with her principal's funds whereby the removal of soil was postponed until full payment of the purchase price some two year's hence. Such terms were manifestly contrary to the purpose for which plaintiff had been engaged. Moreover, plaintiff at no time consulted with her principal concerning the terms of the option, though it was her duty to do so, nor did she disclose its conditions, highly unfavorable to defendant, until she had served her own purposes by procuring the cryptic memorandum of March 1, 1957. Good faith and fair dealing would require both that she communicate the seller's terms to her principal before she signed the option and paid out the principal's money, and that she make known the option's terms and conditions before seeking to deal further with the principal in her own behalf. Her failure to do so, as well as her entire course of conduct, leads us to the conclusion that she abandoned the interests of her prin-

cipal and sought only to advance her own. Such being the case, and assuming satisfactory proof of the oral contract upon which she relies, the public policy which seeks to prevent abuses of fiduciary relationships serves to deny plaintiff the equitable relief she seeks.

Accordingly, for the reasons stated, the decree for specific performance entered by the superior court of Cook County is reversed. *Decree reversed.*