EDWIN S. YEOMANS v. MINNIE NACHMAN, Appellant, MUTUAL ICE FUEL & STORAGE CO., a Corporation, Respondent.

Kansas City Court of Appeals, December 3, 1917.

1. **EQUITY: Mortgages and Deeds of Trust: Duplicate Notes: Note First Negotiated the Valid Lien.** An Ice Company, owner of a tract of land placed the title in a straw man so that he might mortgage it for the Ice Company without complicating the matter with the Ice Company's other business. The matter of mortgaging the land was entrusted to one C who was in the investment business but who was also Secretary and Treasurer of the Ice Company. With-

out the knowledge of the Company, C. procured the execution of duplicate notes, and negotiated one to plaintiff and some two years or more later and after interest thereon had become past due according to its terms, negotiated the duplicate to defendant N. *Held*, that the note first negotiated was the valid note, and that the purchaser of the other obtained no lien.

2. ——: ——: ——: ——: **Right of Innocent Purchaser of Fradulent Duplicate to Compel its Payment on the Ground of Land-owner's Negligence.** Defendant N. bought the note of C. who sold it to her in behalf of his investment company and not as agent of the Ice Company. The latter knew nothing of the fraud and if it was negligent in trusting the matter to C. defendant N. was equally or more negligent. Besides, the fraud perpetrated on N. was committed long after the agency for the Ice Company had been completed; hence, N. is not entitled to compel the Ice Company to make good her loss, nor is the said company estopped to deny liability.

3. ——: ——: **Bills and Notes: Innocent Purchaser: Past Due Interest Coupons.** A purchaser of a note having attached thereto interest coupons that are unpaid and past due, and which provides that if interest is not paid when due then the whole ncte may become due, and which does, not conform to description in deed of trust by which it purports to be secured is chargeable with notice of its infirmities.

Appeal from Jackson Circuit Court.—*Hon. O. A. Lucas,* Judge.

Affirmed.

*Piatt & Marks* for appellant.

*Hadley, Cooper, Neel & Wright* for respondent.

TRIMBLE, J.—The suit, out of which the controversy now before us has evolved, arose because of the fact that plaintiff Yeomans and defendant Nachman each owned and held a Real Estate Mortgage Bond, or note, similar in date, amount and terms, and stating therein that it is secured by a first deed of trust, of even date. There is but one such deed of trust, and only one note described in and secured thereby; and as both of the above-named parties claimed the security, it became vitally necessary to ascertain which was

entitled thereto. Plaintiff Yeomans, therefore, brought an action in equity to have his note adjudged to be the one secured by said deed of trust and himself declared to be the assignee, owner and holder of the note described therein, with power to foreclose the same in case of default. Minnie Nachman, as the claimant and holder of the other note, and the Mutual Ice, Fuel and Storage Company, as the owner of the real estate on which the deed of trust was given, were made parties defendant. In addition to the above-mentioned relief sought, the petition prayed that said Nachman's claim to any right or interest in the deed of trust be held for naught and that she be restrained from asserting, as against the plaintiff, any such right or interest or any lien upon said real estate, and that the Ice Company be given full protection in paying to plaintiff the interest and principal of said note so held and owned by him.

The two notes or bonds, each dated January 15, 1912, were for $2000, payable to the order of the J. S. Chick Investment Company, due five years after date and signed by C. B. Wescott. They bore six per cent interest payable semi-annually evidenced by coupon notes attached.

The defendant Ice Company, in its answer to the petition, admitted that it owned the real estate mentioned and that said real estate was subject to said deed of trust, but denied all other allegations.

In her answer to the petition, the defendant Minnie Nachman asserted that she was the owner of the note described in and secured by said deed of trust, and was entitled to its security; that, if plaintiff held such a note as he claimed, it was a duplicate of the one she held, and was fraudulently issued by Wescott; and the plaintiff's rights were inferior to hers.

She further set up that at the time Wescott executed the deed of trust he was the holder of the legal title to the real estate described therein, but that the same was really owned by the Ice Company who had caused the said real estate to be conveyed to him for

the purpose of executing the said deed of trust, and, after this was done, put the title back into its real owner the Ice Company, he neither paying nor receiving anything of value at the time of the conveyances to and from him; that if duplicate notes were issued by Wescott, then, since the Ice Company knew he was insolvent, and since the real estate was conveyed to and held by him for the purpose of executing said deed of trust and after that was conveyed without consideration back to the Ice Company, the latter should be required to pay both notes, and the real estate should be charged with the lien of both; that in equity and good conscience this is what should be required because the Ice Company, either through connivance with Wescott or through its own carelessness and negligence, put it within the power of, and created the opportunity for, said Wescott to perpetrate such fraud. Wherefore, defendant Minnie Nachman prayed that she be adjudged to be the owner and holder of the true note secured by said deed of trust and entitled to the benefit and security thereof; that the court inquire fully into and determine the facts, and, if it be found that duplicate notes were executed, then that the Ice Company be adjudged liable in equity for the payment of both of them, and that the real estate described in said deed of trust be charged with the payment of both.

To this answer and cross petition on the part of defendant Nachman, the Ice Company filed an appropriate reply and answer, in which the allegations and charges made in said cross-petition were denied and it was alleged that if defendant Nachman held a note as she claimed, it is a counterfeit and forged note neither executed, uttered nor negotiated by Wescott, while he was the owner and holder of said property, nor at any other time.

The chancellor heard the evidence and rendered a decree finding that the note held by plaintiff Yeomans "was the first of the two notes for $2000 executed by said C. B. Wescott negotiated and delivered by the said J. S. Chick Investment Company under and in

pursuance of authority given the said J. S. Chick Investment Company by the owner of the property described above; and the plaintiff, Edwin S. Yeomans, the owner and holder of said note is entitled to the exclusive benefit of the deed of trust of date of January 15, 1912, from C. B. Wescott described above; and the other note of $2000 signed by said C. B. Wescott, now held by the defendant, Minnie Nachman, is unsecured by the deed of trust of date January 15, 1912, by C. B. Wescott above described, and the said defendant, Minnie Nachman, is not entitled to a lien either legal or equitable on the above described real estate securing said note.'' The right of Yeomans to hold his note as a first lien on the property and to have the benefit of the security of the deed of trust was accordingly adjudged to him, while all right to a lien or judgment of any nature was denied Mrs. Nachman. From this decree she appealed.

The Ice Company, conceding that its land is subject to the deed of trust, is willing to pay the debt secured thereby to whomsoever is the true holder thereof, but it very strenuously opposes the idea that it should be required to pay more than one note. We do not understand that Mrs. Nachman now questions that part of the decree which finds that the Yeomans note is the one secured by the deed of trust and which awards to him the right to the security thereof. Indeed, there can be no doubt that the decree is correct in this regard. The deed of trust was executed January 15, 1912. Yeomans bought his note of the Chick Investment Company on February 19, 1912, and received it in due course, for value and duly endorsed, scarcely more than a month after its execution and long before any interest thereon had accrued. Mrs. Nachman did not obtain her note from the Chick Investment Company until September 2, 1914, a little more than two years and a half after its execution, and after five interest coupons had become due. So that the controversy now is no longer between Yeomans and Mrs. Nachman but solely between the latter and

the Ice Company as to whether it shall be required to also pay Mrs. Nachman's note.

' The theory, upon which appellant seeks to hold the Ice Company and its property liable for the payment of her note, is that she is an innocent holder thereof, having purchased it for value before maturity and without notice, actual or constructive, of the fraudulent duplication; and the Ice Company, having placed the title of its lot in a straw man for the purpose of obtaining a loan thereon, and having carelessly left said matter entirely to its agent, J. S. Chick, Jr., or which is the same thing the Chick Investment Company, and having negligently allowed the legal title to its property to be placed in Wescott's name, said company thereby became bound by the fraudulent acts of Wescott or Chick, and, since said company's negligence made possible the fraudulent duplication, it should stand the loss, on the principle that where one of two innocent persons is to suffer, it should be that one whose carelessness and confidence put into the hands of the wrongdoer the opportunity and means of doing the wrong; and that the Ice Company, having placed the title to its property in a straw mortgagor and carelessly left said matter to its agent Chick, one or both of whom made her note and perpetrated the fraudulent duplication, is now estopped from disputing appellant's right to a lien. The principles on which appellant's theory rests are well established. [National Safe Deposit Co. v. Hibbs, 229 U. S. 391, 396; Fairgate Realty Co. v. Drozda, 181 S. W. 398, 400, 402; Allen v. South Boston R. Co., 5 L. R. A. (Mass.) 716; 5 Thompson on Corp., sec. 6325; Brown v. Kansas City Southern R. Co., 187 Mo. App. 104, 112; Leonard v. Shale, 266 Mo. 123; Schultze v. McLean, 93 Cal. 329, 357; 27 Cyc. 1036; Guffey v. O'Reiley, 88 Mo. 418; Burson v. Huntington, 21 Mich. 415, 432; 2 Herman on Estoppel, secs. 766, 777; 16 Cyc. 773; Roumeloitis v. Missouri Pac. R. Co., 165 S. W. 818; Houtz v. Hellman, 228 Mo. 655, 669-71; Rieschick v. Klingelhoefer, 91 Mo. App. 430, 433; Riley v. Vaughn, 116 Mo. 169, 178; Barrett v.

Baker, 136 Mo. 512, 517.] But the difficulty is in the application of these principles to the facts and circumstances of appellant's case. And the correct solution of the problem presented is further complicated by the difficulty in "determining what acts or conduct of the party sought to be charged, can properly be said to have enabled the third person to occasion the loss within the meaning of the rule." [Burson v. Huntington, 21 Mich. 431-2.]

The facts considered necessary to an understanding of this feature of the case are these: J. S. Chick, Jr., was the president of the J. S. Chick Investment Company and so controlled and managed the same that for the purposes of this case the two, Chick and his company, may be treated as one and the same. He and it were engaged in the real estate and loan brokerage business. Chick was also the Secretary and Treasurer of the Ice Company; and whenever the latter needed anything in the way of real estate deals or loans, that matter was turned over to Chick, or his Investment Company, as the Ice Company's agent to attend to same. Chick himself attended to it and did so in his capacity as agent for the Ice Company rather than as Secretary and Treasurer of the latter. Wescott was a man of straw in the office of the Investment Company. In the real estate matters turned over to Chick by the Ice Company, the latter trusted Chick implicitly and left the details to him and exercised no supervision over him as to how or in what way he transacted the real estate matters for the Ice Company.

The land described in the deed of trust is Lot 97 Campbell's Addition to Westport. It is a vacant lot adjoining, and on the north side of, the land on which the Ice Company erected its plant. The Ice Company was incorporated the latter part of 1906. Said Lot 97 was acquired by the Ice Company August 15, 1908, but the title was not taken in its name but in that of Mary M. Winship, a bookkeeper in the Chick Investment Company. On the same day, she executed a deed of trust thereon for $2000, with the Chick Investment

Company as *cestui que trust,* to secure a loan of that amount made by one Kiger. Two days later, August 17, 1908, she conveyed said lot to the Ice Company. On the 31st of October, 1908, the directors of that company, with the full knowledge and consent of the stockholders, passed a resolution authorizing the reconveyance of said Lot 97 to Miss Winship subject to said $2000 loan and this was done. No money passed in these transactions between the Ice Company and Miss Winship, she being a mere "straw woman" holding the title, the purpose being to get the title to Lot 97 out of the name of the Ice Company and into that of a straw person. The Ice Company says the reason it did this was that it was about to issue bonds on its plant and did not want the bonds to cover the vacant lot because they contemplated erecting on it a duplicate plant and therefore wanted it free from the bond issue so that when the duplicate plant was erected, bonds could be issued on it for the cost thereof. From October 31, 1908, until February 28, 1912, the title to Lot 97 was allowed to remain out of the Ice Company's name, the company letting Chick, as stated, direct the manner of keeping the title to Lot 97 separate from its other property, and it did whatever he suggested in this regard. The account books of the Ice Company were also kept in Chick's office. The company exercised no care or supervision whatever over Chick to see what was being done in regard to the title to said Lot 97. It seems that Kiger, who held the $2000 loan on the lot, wanted his money; and the matter of getting a renewal, and the manner of doing so, was left to Chick to manage as he saw fit, just as other similar details relating to real estate had been left to him. Chick had Miss Winship convey said lot, for a recited consideration of $12000, to C. B. Wescott, as stated, a man of straw connected with the Chick Investment Company, and who, the evidence shows, was employed and paid to act as such. This deed was made January 15, 1912. On this same date, he executed the deed of trust in controversy to secure the note therein described, and then conveyed the lot, subject to said deed of trust, to the

Ice Company, the deed from him being for a recited consideration of $12000, dated January 15, 1912, acknowledged January 16, 1912, and recorded February 28, 1912. During all this time the actual ownership of the lot was in the Ice Comapny, it authorizing and allowing the title to be held in the name of a straw owner and authorizing the making, by a straw person, of the deed of trust of January 15, 1912, in substitution for the Kiger loan; and while the company may not have actually known that the title was put into the straw man Wescott in making the loan, yet, as all details were left to Chick to manage as he saw fit, and no supervision over him was had, it is the same as if the company knew of and consented to that also. The company must also have had constructive knowledge of this from the records from and after February 28, 1912, the date of the recording of the Wescott deed to the Ice Company.

On account of the foregoing facts and circumstances, it is claimed that in equity the Ice Company should be required to pay Mrs. Nachman's note and is estopped to deny its validity.

By her pleading, Mrs. Nachman has planted her case on the premise that her note bears the genuine signature of Wescott and that any fraud perpetrated was by him in executing two notes in duplicate. So that in order for her proof to correspond strictly to her pleading, the burden is on her to show that her note bears Wescott's genuine signature and is not mere forgery afterwards committed by Chick and sold by him to her. The Ice Company contends that there is no evidence to show that Wescott signed Mrs. Nachman's note in addition to the one Yeomans got. We think the evidence tends to show her note bears his true signature but that it does not show when it was signed. Miss Winship, who took the acknowledgment to the deed of trust, and who was acquainted with his signature, testified that the signature on the two notes is the same. When the deed of trust was executed Miss Winship had no idea or knowledge of his signing more than one note; and

while she thinks he signed other papers than the deed of trust and note, she does not know what they were, but would not say that more than one note was signed. Wescott was not called as a witness nor was Chick, and there was no other evidence offered as to the genuineness of the Nachman note nor as to when it was executed. We think, therefore, that the evidence shows that appellant's note bears Wescott's true signature but does not show *when* he signed it. So far as the evidence affirmatively shows, Chick may have fraudulently induced Wescott to sign it afterwards. Appellant relies upon section 9982, Revised Statutes 1909, as creating the presumption that the date on her note is the date it was made. If we concede that said statute applies to this note as well as to a valid note about which there is no suspicion, we may treat appellant's case on the theory that the evidence supports her claim that the two notes were fraudulently executed by Wescott at the time the deed of trust was executed. However, even if both were executed at the same time, only *one* could be the true note, depending upon which one was first negotiated, and as Yeomans' note was that one, the other is not *the genuine note* secured by the deed of trust. [Quinn v. McCallum, 178 Mo. App. 241.] So that the deed of trust in and of itself can have no efficacy in giving appellant a right to any lien on the Ice Company's property. Chick first sold Yeomans' note to him, and years later, sold Mrs. Nachman's note to her. Clearly, the *proximate* fraud or the fraud *operating on Mrs. Nachman* was that of *Chick* in selling to her a note the original of which he had already sold to Yeomans. The Ice Company denied that Wescott executed or negotiated the note held by Mrs. Nachman, and, therefore, if her note was not signed by Wescott, then it was not his fraudulent duplication that caused the loss, as pleaded by Mrs. Nachman, but was Chick's fraud in forging a note and selling it to her. In that event, aside from a mere difference between her proof and her case as pleaded, she has failed to establish the case as presented. We

prefer, however, to regard the evidence as establishing that Wescott did sign the note Mrs. Nachman got, and we will treat her case on the assumption that he did so at the time the other note and deed of trust were signed. In which event his act in so doing, whether intentional and a matter of actual fraud on his part, or whether he was innocently induced to do so by the machinations of Chick, resulted in a fraud on Mrs. Nachman, so that she cannot be denied relief on the ground that she has failed in her proof in the particular above mentioned. It is important to note, however, that the fraud which finally and effectually caused Mrs. Nachman's loss was *Chick's* fraud in selling her the note she got, which of course was a fraud on his part, since he had already sold to Yeomans the note he received. This is important because, in selling her this note, he was not acting as agent for the Ice Company. So far as Mrs. Nachman was concerned, he was selling her a note the Investment Company held. He was acting for himself and the Investment Company and was selling a note to his and its customer. The Ice Company had nothing to do with selling the note to her. It knew nothing of it. The Ice Company knew nothing of her, paid her no interest, and had no dealings whatever with her. She did not go to Chick as Secretary and Treasurer of the Ice Company. She went to the Chick Investment Company, as she had done once before, to purchase a note as an investment of her money. The fact that Chick happened to be Secretary and Treasurer of the Ice Company had nothing to do with inducing her to purchase said note, and Chick's knowledge is not the knowledge of the Ice Company. [Gregmoore Orchard Company v. Gilmour, 159 Mo. App. 204, 213-14; Third National Bank of St. Louis v. St. Charles Savings Bank, 244 Mo. 554, 606.] The agency in Chick created by the Ice Company to obtain a renewal of the Kiger loan had been fully performed by Chick when he got Yeomans to take it up, and thereafter the Ice Company regularly paid the interest to Yeomans for two years and more

before Mrs. Nachman got her note. It never knew anything about her note or about her until long afterward, possibly in the latter part of December, 1915, when the whole story of Chick's irregularities came to light and everybody found out the true situation, and this suit was instituted. From the time Yeomans got his note, the Ice Company paid him his interest down to the date of the discovery of the situation by all parties as aforesaid. Mrs. Nachman, when she bought her note of Chick in 1914, knew she was getting a note signed by a person named Wescott secured by a deed of trust on land belonging to the Ice Company, yet she made no inquiry to learn who Wescott was, nor did she disclose herself in any way to the Ice Company at any time although she thought her security covered its entire plant worth many times the amount of her loan. She made Chick her agent to collect her interest and received it from *him,* not from the Ice Company. Under all these circumstances we do not see what knowledge the Ice Company had of Mrs. Nachman or of her note, nor what it failed to do, which should estop it from contesting the validity thereof. None of the money she paid to Chick ever went to the Ice Company. Her loss was caused by Chick's fraud and in so doing he was either acting for himself and his Investment Company or as her agent. It is true the Ice Company trusted Chick and relied implicitly upon him to renew the Kiger loan. This he did, and that task was fully completed long before the fraud on Mrs. Nachman was perpetrated. But the act of the Ice Company, in trusting Chick to renew said loan and allowing him to do so in his own way, was no more negligent than—certainly not as much so as—Mrs. Nachman was. She trusted him implicitly too, accepted without question what he told her, and made him her agent to collect the interest. He paid her this, but not out of any funds belonging to the Ice Company or in any way that charged the company with notice that she also had a note against its property. Chick's reputation for honor and integrity was

unquestioned at this time. The reasons for renewing the Kiger loan, and for keeping that property free from the entanglements of the Ice Company's bonded indebtedness, were legitimate and proper, and if the Ice Company was negligent in trusting Chick, so also was Mrs. Nachman, and more so, as we shall presently see. This is not a case where Wescott, the straw man in whom the Ice Company permitted its title to be placed, made two deeds of trust. If that were the situation an entirely different question would be presented. The situation here is that Chick was the agent of the Ice Company to do a certain thing which was legitimate and proper. He performed his task as such agent, and the Ice Company supposed and had a right to think, that it was ended. Afterwards, and while acting as agent for Mrs. Nachman, or as agent for his Investment Company in selling her a bond, he succeeded in defrauding her. Of this the Ice Company had neither actual nor constructive knowledge. Nothing that it did, or failed to do, induced Mrs. Nachman to purchase the note. We, therefore, fail to see wherin an estoppel is created against it.

But appellant says that she is an innocent holder and where one of two innocent persons must suffer for the act of a third, the loss should fall upon that one who afforded the third party the opportunity of doing the wrong and enabled him to perpetrate the fraud and cause the loss. We do think that, under the facts of this case, Mrs. Nachman is an innocent holder, and, if she was not, then also arises the question whether it was her conduct and not the Ice Company's that enabled the fraud to be perpetrated. Because, as to her, the fraud was not complete nor her loss *accomplished* until Chick sold her the note.

The note provided that if default was made in the payment of any of the interest when due, then the whole note, principal as well as interest, could become due. At the time she bought the note at least five of the interest coupon notes were past due and were

unpaid as they were still attached to the note. These Chick tore off in her presence and with her knowedge and consent. She testified. to this herself. It is true she afterwards went upon the stand and said she did not understand what was asked of her in that regard and that she did not really remember what coupons were on the note ,at the time she, bought it. But her former testimony is so clear and explicit that we accept it as she at first gave it. The coupons were themselves promissory notes but only the bond itself was endorsed. The deed of trust said that the holder of the note had the privilege of paying $500 or any multiple thereof at any interest paying period, but the bond said nothing about any such privilege. In this respect, the note did not conform to the description thereof contained in the deed of trust. It is true Yoemans' note did not have such a clause either, but this is immaterial, since the point is that, so far as Mrs. Nachman is concerned, there was a difference between her note and the des- cription thereof in the deed of trust, both of which she obtained at the same time. She accepted the opinion of Chick's attorney as to the title to the land at the time the deed of trust was given, but it gave no in- formation as to the title or ownership thereafter. She did not know who the maker of the note was. Never investigated or made inquiries, nor did she ever look to the Ice Company, inform it or commun- icate with it in any way. She left the entire matter with Chick, accepted what he said about it, and made him her agent in all matters pertaining to it. Under such circumstances Mrs. Nachman cannot claim that she was wholly without notice of the note's infirmities. [Merchants National Bank v. Brisch, 154 Mo. App. 631, 639.] Nor can she claim that it was not her negli- gence but that of the Ice Company that enabled Chick to accomplish his fraud upon her.

We do not understand that in her pleadings Mrs. Nachman has based her claim against the Ice Company upon the fraud of *Chick* as its agent, but if her plead-

ing may be regarded as including that charge, then, clearly, when Chick accomplished the fraud and caused the loss, he was not acting for, but against, the Ice Company. He had performed the duty assigned him by it, and in selling to Mrs. Nachman her note he was wholly outside of the scope of his employment, and there was no *apparent* authority from the Ice Company upon which she relied or on account of which she was induced to buy the note [Keyser v. Hinkle, 127 Mo. App. 73; 31 Cyc. 1584; Whiteaker v. Chicago Rock Island & Pac. R. Co., 252 Mo. 438, 458; Garretzen v. Duenckel, 50 Mo. 104; St. Louis, etc., R. Co. v. Harvey, 144 Mo. 806, 809; Hellriegal v. Dunham, 192 Mo. App. 43.]

It is unfortunate and distressing that Mrs. Nachman has fallen a victim to the fraudulent practices disclosed by the evidence in this case. But while she is entitled to sympathy, there is, in our view, no ground upon which a court of equity can rightfully require the Ice Company to make good her loss. The decree is, therefore, affirmed. All concur.