Mary George et al., Appellants, v. H. B. Surkamp et al.—76 S. W. (2d) 368.

Division One, November 16, 1934.

2

*Taylor R. Young* and *P. H. Cullen* for appellants.

4

*Rassieur, Long & Yawitz* for Lafayette-South Side Bank & Trust Company.

STURGIS, C.—The plaintiff Mary George recovered a judgment against defendant Louis Leitner on February 16, 1926, for $7,500 in a personal injury action in the Circuit Court of the City of St.

Louis. Being unable to collect such judgment on ordinary execution, she brought the present action in July, 1926, in that court for the purpose of subjecting to the payment of her judgment a promissory note for $11,000 secured by a deed of trust on certain improved real estate in St. Louis which had been and which the plaintiff claims was yet in truth and in fact the property of the judgment defendant. This note and deed of trust, dated July 1, 1925, was executed by Esther Fine in favor of defendant Edward Leitner, a son of defendant Louis Leitner, on the property in controversy, which formerly belonged to Louis Leitner, the judgment defendant, and which was conveyed by him without any consideration, pending the personal injury action, to his said son for the purpose of defeating the collection of the anticipated injury judgment. In furtherance of this same purpose, the son, Edward Leitner, conveyed the property to Esther Fine, who on the same date executed the note and deed of trust in question representing the purchase price. The defendant Surkamp is the trustee in this deed of trust, Esther Fine acting as the mere conduit of the legal title which was conveyed to her, and after executing the note and deed of trust conveyed the legal title subject thereto to the defendants Joseph Gordon and wife, who claim to own the equity of redemption.

Going a little more into detail, plaintiff Mary George, a married woman, in May, 1922, suffered severe personal injuries in consequence of the negligence of the defendant Louis Leitner, who then and for some time previous had owned the improved real estate in question. Suspecting that he would be sued for the injuries, Louis Leitner informed Mary George that he was willing to pay her medical expenses but that if she employed a lawyer and brought suit for damages, he would convey all his property to his son, then just of age, and would see to it that she never collected a cent. Some seven months later, in September, 1922, plaintiff Mary George did bring such damage suit and while the same was yet pending and before a trial, Louis Leitner in June, 1924, made good his threat to convey his property to his son and by deed of that date he and his wife conveyed this St. Louis property to his son, Edward Leitner, for the recited consideration of "One Dollar and love and affection." The real property in question was then worth some $19,000 and it is conceded that this conveyance to the son was a deed of gift. Defendant Louis Leitner testified that he did not convey the property to beat the anticipated judgment in the pending $10,000 damage suit but merely to carry out his cherished design to give this property to his son on his reaching manhood. As a sidelight, it may be mentioned that there was also then pending a damage suit by the husband of Mary George growing out of the injury to her, which later resulted in a judgment for $3,000 against defendant Louis Leitner. Immediately on receiving conveyance of this property, the son, Ed-

ward Leitner, conveyed the same to Esther Fine, who gave back the note for $11,000 and the deed of trust on this property securing the same. These three conveyances of this property were practically of the same date and were one transaction and, it is claimed, were for the real benefit of defendant Louis Leitner and made to cover up his property against the anticipated judgments. In February, 1926, the damage suit came to trial and resulted in a judgment for this plaintiff for $7,500 against defendant Louis Leitner. Coincident with this judgment, defendant Louis Leitner conveyed to his said son the property he owned as a summer home at Minoqua, Wisconsin, so that when plaintiff's judgment for damages became effective the defendant Louis Leitner had divested himself of all his property and the legal title was vested in his son, Edward Leitner, who held the St. Louis property in controversy by means of the deed of trust and secured note for $11,000. That these conveyances from Louis Leitner to his son, Edward Leitner, were made for the purpose of defeating the collection of the anticipated judgment of plaintiff against him for damages is too plain for argument and the trial court so found.

In order to collect her said damage judgment by following defendant's property into the hands of the fraudulent grantee, Edward Leitner, plaintiff Mary George, some six months later, in July, 1926, brought the present action making Louis Leitner, defendant in the damage suit, Edward Leitner, the fraudulent grantee of his property and holder of the deed of trust and secured note on same, H. B. Surkamp, trustee in said deed of trust, and Joseph Gordon, the holder of the legal title to the St. Louis property subject to such deed of trust, parties defendant, the object being to subject the secured note and the security on the real estate to the payment of plaintiff's judgment. In aid of this suit and to prevent any further transfer of the secured note and deed of trust or of the property securing same into the hands of a possible innocent holder, plaintiff, on bringing the present action in July, 1926, also filed a *lis pendens* in the office of the Recorder of Deeds in St. Louis. As a counter move the defendant Louis Leitner in September, 1926, filed a voluntary petition in bankruptcy in the United States Court of Wisconsin, being at that time a resident there. He stated in his bankruptcy proceeding that he owned no property and named this plaintiff, Mary George, as being his only creditor and her damage judgment as being his only indebtedness. C. M. Whitmore was appointed and qualified as his trustee in bankruptcy. The referee in bankruptcy, on becoming informed as to the transfer of his property by the bankrupt to his son, as we have stated, ordered the trustee in bankruptcy to take any proper steps necessary to recover for the bankrupt estate any property fraudulently conveyed by the bankrupt. Thereupon such trustee in bankruptcy, C. M. Whitmore, applied for and was granted

permission to intervene as a party plaintiff in the present action and by leave of court he filed an intervening petition based on much the same allegations as contained in the petition of Mary George and seeking much the same relief. The defendants Louis Leitner and Edward Leitner, while filing an answer and giving evidence in the case, seem to be somewhat indifferent as to the result of the present litigation and they are not represented in this court. The defendants Gordon and wife claim no more than that they own the real estate in controversy in good faith, subject, however, to the deed of trust for $11,000 and unpaid interest thereon, and indicate a willingness to pay same to whomsoever the court may direct.

The real controversy in the present suit was brought about by the action of Dr. Thomas G. Torpy of Minoqua, Wisconsin, the Lafayette South Side Bank & Trust Company of St. Louis, and Benj. G. Brinkman, a director of such bank, in asking and being allowed without objection to intervene and become parties defendant in this action as claimants of full ownership or at least a substantial interest in the secured note for $11,000 and the deed of trust on the St. Louis property securing the same. By this intervening petition, or rather answer, it was alleged that in January, 1926, while the damage suit of plaintiff against defendant Louis Leitner was pending, but shortly before plaintiff secured her judgment in damages, Dr. Thomas G. Torpy, for value and in good faith, purchased from Edward Leitner, owner of the same, the said note for $11,000 secured by the deed of trust on the St. Louis property. It was therein alleged that prior to the filing of the present action, "Thomas G. Torpy, one of the interveners herein, purchased the aforesaid principal note and certain of said interest notes and the deed of trust conveyance of said property securing said notes; that he purchased the same before maturity and for the reasonable value thereof, which was paid at the time, and that said Thomas G. Torpy was then wholly ignorant of any fraud or claim of fraud relating to the same or any conveyance affecting said property, and was without notice thereof, and purchased the same in good faith and for value, and that said notes and deed of trust securing the same were then assigned to said Torpy, whereby he became and now is the true and lawful owner of said notes and deed of trust and is a bona fide purchaser thereof for value before maturity and without notice of any fraud, claim of fraud or controversy affecting the same." It is further alleged that "after purchasing said notes and deed of trust said Torpy pledged the same to and with intervener Benj. G. Brinkman to secure a loan for $10,000 then made by him to said Torpy and that thereafter said notes and deed of trust securing same were delivered to and deposited with intervener Lafayette South Side Bank & Trust Company of St. Louis to secure a loan of $10,000 made by said bank, whereby intervener Benj. G. Brinkman and thereafter Lafayette

South Side Bank & Trust Company became lawful and bona fide pledgees of said notes and deed of trust for value before maturity and without notice of any fraud of controversy affecting the same, and that said Lafayette South Side Bank, one of the interveners herein, is now the true and lawful holder thereof as pledgee.'' The defendant interveners denied, for want of any information or belief on the subject, any fraud in connection with the deed from Louis Leitner to his son, Edward Leitner, or fraud in connection with the deed of trust and secured note taken by such son and afterwards purchased by Dr. Torpy. The trial court sustained the contentions of the defendant interveners and dismissed plaintiffs' petition. Plaintiffs have appealed. Only the intervening defendant Lafayette Bank has appeared in this court to sustain the trial court's action.

It is not seriously controverted here but that the trial court correctly held that ''there is no question but that Louis Leitner and wife transferred (indirectly) the deed of trust to their son Edward to avoid payment of the damage suit judgment, and they also transferred all their other holdings in Wisconsin for the same reason'' and as a mere gift. Conveyances made for the purpose of defeating an anticipated judgment in a case pending or about to be commenced are in fraud of creditors and void as to such plaintiff. [Snitzer v. Pokres, 324 Mo. 386, 400, 23 S. W. (2d) 155; Creamer v. Bivert, 214 Mo. 473, 113 S. W. 1118; Jones v. Jefferson, 334 Mo. 606, 66 S. W. (2d) 555.] Passing for the moment the alleged bona fide purchase of the note and deed of trust by Dr. Torpy from the fraudulent grantee, Edward Leitner, we are constrained to hold that neither Benj. G. Brinkman nor the Lafayette Bank can claim protection on the ground that they or either of them are purchasers in good faith and for value before maturity of this secured note. Their claim is that in August, 1926, some six months after Dr. Torpy had purchased the secured note, intervener Brinkman, at Minoqua, Wisconsin, where Dr. Torpy lived and he was a summer visitor, loaned Dr. Torpy $6,000 and took the secured note in controversy as collateral security, and that Brinkman in turn borrowed $10,000 from the Lafayette Bank and pledged to it the same secured note as collateral security. Brinkman was one of the directors of this bank and the facts show that while his check for $6,000 to Dr. Torpy in payment of this loan to him was dated a few days earlier, it was not cashed till after the bank's loan to Brinkman was placed to his credit. Besides this, the plaintiff's *lis pendens* had then been filed and was on record at the time these loans were being made on this collateral security, and we think defendants are charged thereby with constructive notice of the pending litigation. It is true that the doctrine of *lis pendens* or constructive notice does not apply to negotiable instruments, such as the $11,000 secured note here in question, when purchased in good faith for value and before ma-

turity. [38 C. J. 13; Carr v. Lewis Coal Co., 15 Mo. App. 551, 554, affirmed in 96 Mo. 149, 158, 8 S. W. 907; Dodd v. Lee, 57 Mo. App. 167, 172; Town of Enfield v. Jordan, 119 U. S. 680, 30 L. Ed. 523.]

■ It is also true, as claimed by the intervening defendants, that a sale and assignment of the secured note carries with it the deed of trust and that there is no need of or force to an assignment of the deed of trust itself separate and apart from the note. [George v. Somerville, 153 Mo. 7, 14, 54 S. W. 491; Crawford v. Aultman & Co., 139 Mo. 262, 270, 40 S. W. 952; Baade v. Cramer, 278 Mo. 516, 529, 213 S. W. 121.] As against the purchaser of a negotiable note for value in good faith before maturity and without notice, "where the note is secured by a deed of trust, as in the case at bar, the deed of trust passes with the transfer of the note, as incident thereto, free from any and all defenses except such as could be made against the note." [Borgess Inv. Co. v. Vette, 142 Mo. 560, 573, 44 S. W. 754.] In other words, the deed of trust securing a negotiable note passes with it and partakes of the same characteristics of negotiability and freedom from secret equities and liens in favor of the good faith purchaser for value and without notice as does the note itself. [Hagerman v. Sutton, 91 Mo. 519, 531, 4 S. W. 73.] In First Natl. Bank v. Rohrer, 138 Mo. 369, 383, 39 S. W. 1047, it is held: "Whatever the rule may be elsewhere, it is well settled in this State that the purchaser in good faith for value before maturity of a negotiable promissory note secured by mortgage upon real estate, takes the security, which passes as incident to the note, free from the equities or any private arrangement between the original parties. [Patterson v. Booth, 103 Mo. 402; Logan v. Smith, 62 Mo. 455.]" In Mayes v. Robinson, 93 Mo. 114, 123, 5 S. W. 611. it is said: "If the defendant took the note discharged of any equities to which it was subject in the hands of the payee, the deed of trust passed to him discharged of such equities to the same extent. [Logan v. Smith, 62 Mo. 455.] The deed of trust being incident to the note partook of the negotiability of its principal. [Hagerman v. Sutton, 91 Mo. 519. and authorities cited.] If the defendant was a bona fide holder of the note for value before maturity, without notice, he was in equal measure such bona fide holder of the deed of trust." And in Crawford v. Aultman & Co., 139 Mo. 262, 270, 40 S. W. 952, it is held that a deed of trust is a mere incident to the negotiable note to secure whose payment it was given. A transfer of the note before maturity for value, therefore, also carried with it the deed of trust, and where it has been clearly shown that both note and deed of trust were obtained by fraud, a suit to set aside and cancel both, after the note has been transferred before maturity to another person who is not made a party to the suit, cannot be maintained. What is above said with reference to purchasers of negotiable notes applies also to persons taking same as collateral security. [Eggimann v. Houck, 213

Mo. App. 510, 515, 255 S. W. 951; Farmers State Bank v. Miller, 222 Mo. App. 633, 638, 300 S. W. 834.]

This court, however, in Patterson v. Booth, 103 Mo. 402, 416, 15 S. W. 543, said that "the principal of these cases (Hagerman v. Sutton and Mayes v. Robinson, supra) is, that if a mortgage is given to secure a negotiable note the assignment of the note carries the security as an incident, and, if the note is transferred before maturity to a bona fide indorsee, such indorsee takes the benefit of the mortgage as well as of the note, *free from equities between the original parties*," but in applying the doctrine "other principles of law are not to be overlooked." That was a case where the equitable owner of land sought to set aside a deed of trust thereon wrongfully executed by the holder of the legal title as against the bona fide purchaser for value before maturity of the secured note without knowledge of plaintiff's equitable title. It was found, however, that the recorded deeds constituting the mortgagor's legal title contained recitals disclosing the equitable title, as to which the mortgagor and anyone holding under him must take notice, thus giving such grantees constructive notice of the plaintiff's equitable title. This constructive notice of the equitable title imparted by the recorded deeds was held sufficient to overcome the plea of innocent purchaser of the secured note for value before maturity. The court there said: "In the first place the plaintiff was not a party to the note or mortgage (that is, not one of the 'original parties'). The question here is not one where a maker of a negotiable note seeks to interpose a defense against the assignee of the note and mortgage. The plaintiff's equitable title to the land is *prior to the mortgage* and he should prevail as against all persons having actual or constructive notice of his equitable title. . . . A mortgagee of real estate and his assignees of the secured debt stand in no better position than a purchaser of the land and his assignees. The doctrine of constructive notice imparted by a recorded instrument applies alike to deeds and to mortgages. The assignee of the mortgage takes it subject to all prior liens and mortages, which are duly recorded, because he has constructive notice of them. (Cases cited.) If the title of the mortgagor is impressed with a trust in favor of a third person at the date of the mortgage and this trust is disclosed by the recorded title, as it was in the case in hand, it can make no difference whether the note secured by the mortgage is negotiable or nonnegotiable. In such case every assignee, as well as the mortgagee, is charged with constructive notice of the trust and must yield to the trust. . . . The plaintiff's equitable title to this land is prior and paramount to the defendant's mortgage, for Horner had nothing but the legal shell, and, as defendant took the mortgage with constructive notice of the facts which raise and create the plaintiff's equitable title, the plaintiff should prevail." In the present case plaintiff's equitable

right to have the land or deed of trust thereon subjected to the payment of her damage judgment existed prior to the purchase of the secured notes by interveners Brinkman and the Lafayette Bank and plaintiff's recorded *lis pendens* was as potent in imparting constructive notice of plaintiff's equitable rights as was the recital in the deeds constituting the mortgagor's title in Patterson v. Booth, supra.

In Dodd v. Lee, 57 Mo. App. 167, it appears that the owner of land executed two deeds of trust on the same day, one to the plaintiff to secure notes representing the purchase price of the land, and the other an ordinary loan. Because of this fact and by agreement the plaintiff as owner of the purchase money mortgage was to have the first lien on the land, but through fraud the deed of trust securing the other loan was put of record and the purchase money deed of trust withheld from record. On discovering this fact, the holder of the purchase money mortgage brought suit to have the record lien of the other deed of trust declared subordinate to his deed of trust. Thereupon one Richards intervened as a defendant, claiming to be a bona fide purchaser for value of the notes secured by the other deed of trust, having relied in purchasing same on the record title and without any knowledge of the equitable claim of plaintiff to a superior lien. The court held that the evidence supported the defendant's innocent purchaser claim unless the recorded *lis pendens* constituted constructive notice of plaintiff's equitable claim of priority, thus defeating the claim of innocent "purchaser for value and before maturity of a negotiable promissory note, which is secured by a mortgage on land, will be affected by, and taken subject to, a statutory notice of *lis pendens* filed prior to his purchase, when such notice relates to an equity not between the original parties to the mortgage, but between a third person and the mortgagor." In the opinion the court further said that from the standpoint of absolute protection of bona fide purchasers of negotiable instruments against subsequent equities or infirmities as to title, the defendant Richards "persuasively argues that, as a mortgage is a mere incident to the debt, it ought, under like circumstances, be protected against the operation of the rule of *lis pendens*. . . . Some expressions in the opinions in the cases of Hagerman v. Sutton, 91 Mo. 519, and Mayes v. Robinson, 93 Mo. 114, seem to support this contention; but the more recent case of Patterson v. Booth, 103 Mo. 402, expressly decides that a bona fide indorsee of unmatured negotiable paper, which is secured by a mortgage, takes the mortgage *free only* from existing equities between the original parties. In Logan v. Smith, 62 Mo. 455, the court expressly decided that the mortgage is not negotiable. The fact, that the *lis pendens* notice was properly filed before Richards bought the notes, cannot be denied. Neither can it be denied that Richards bought on the faith of the abstract, without actual notice of the pendency of the plaintiff's suit. Never-

theless, under the undisputed evidence, as applicable to the law of *lis pendens*, the mortgage of Richards must be held subordinate to that of plaintiff. . . . The plaintiff insists that, as his equities against Lee are clear and undisputed, they must be enforced against Richards who bought after the notice of *lis pendens* had been filed, and that the previous acts and conduct of the plaintiff present an immaterial inquiry. This position cannot be defended (that is, must be upheld), for the reason above stated, that the law of *lis pendens* exists and is enforced not by reason of legal presumption of notice but upon grounds of public policy. [Turner v. Babb, 60 Mo. 342; Herrington v. Herrington, 27 Mo. 560.] . . . Our conclusion is that Richards, being a purchaser *pendente lite* of the Lee mortgage, must occupy the place of Lee in this litigation. The plaintiff's equities against Lee clearly appearing, the judgment of the circuit court must be reversed and the cause remanded, with directions to enter a decree adjudging the plaintiff's deed of trust to be the prior incumbrance.''

Moreover, the evidence is that Brinkman had actual knowledge that plaintiff's *lis pendens* was on record at the time he loaned Dr. Torpy the $6,000 and took the $11,000 secured note as collateral security. He testified that Dr. Torpy first tried to sell him the secured note outright at Minoqua, Wisconsin, but that he decided not to do this till he went to St. Louis and investigated the title of the mortgaged property; that he then learned of the recorded *lis pendens* and informed Dr. Torpy as to this and decided to do no more than loan Dr. Torpy $6,000 on the note for $11,000 and deed of trust securing same as collateral security. As we have said, Brinkman was at the time a director of the Lafayette Bank and at once pledged this same $11,000 secured note as collateral for a loan by the bank to him of $10,000. Whether his knowledge of the pending suit to subject this secured note to the payment of plaintiff's damage judgment was also knowledge of that bank need not be further discussed since we are holding that such bank is charged with constructive knowledge at least.

The record further shows that the secured note for $11,000, of which intervener defendants claim to be innocent purchasers for value before maturity, bore interest at six per cent, payable annually, evidenced by coupon notes for $330 each attached thereto. When plaintiff's *lis pendens* was filed for record the owners of the mortgaged land stopped paying interest. At least two coupon interest notes were past due and unpaid at the time Dr. Torpy pledged the secured note to Brinkman as collateral security and Brinkman in turn pledged same to the Lafayette Bank and these unpaid interest notes were part of the collateral security. Brinkman testified that he received and knew of these unpaid interest notes being in default and that when he pledged the same to the Lafayette Bank

14

he instructed that bank to at once collect the defaulted interest notes. The law is settled that one who purchases a negotiable note, knowing at the time that default has been made in the payment of interest thereon which remains past due and unpaid, cannot claim the protection afforded an innocent purchaser purchasing before maturity. [Chouteau v. Allen, 70 Mo. 290, 339; Yeomans v. Nachman, 198 Mo. App. 195, 207, 198 S. W. 180; Merchants' National Bank v. Brisch, 154 Mo. App. 631, 639, 136 S. W. 28.]

■ It is only left for us to decide whether or not Dr. T. J. Torpy, who lived at Minoqua, Wisconsin, was a bona fide purchaser for value of the secured note in question from Edward Leitner, the son of and fraudulent grantee of defendant Louis Leitner. We recognize, of course, that if Dr. Torpy was a purchaser of this negotiable note in good faith and for value, then as such purchase was before its maturity and before plaintiff's *lis pendens* was filed or the present action commenced giving constructive notice of the fraud, the intervening defendants will be protected because of their holding under an innocent purchaser. [8 C. J. 466; Secs. 2686 and 2687, R. S. 1929; McMurray v. McMurray, 258 Mo. 405, 417, 167 S. W. 513, and cases cited.] As we have noted, Edward Leitner conveyed the property fraudulently deeded to him by his father without consideration and for the purpose of defrauding this plaintiff, to Esther Fine and took back the $11,000 note in question secured by deed of trust in payment of the purchase price. The evidence is that the property was worth more than the amount of the secured note and that young Leitner received considerable cash. Edward Leitner continued to hold this secured note till January, 1926, some six months, when Dr. Torpy claims to have purchased it, together with a lot in Minoqua worth some $600 to $800 for $10,000 in cash, a considerable discount. Dr. Torpy was at the time and long had been a resident physician of Minoqua, a village of some two hundred inhabitants and a summer resort where the Leitners had a summer home and they later became permanent residents. In view of the fact that the trial court, to whose findings we naturally defer to considerable extent, held that the purchase by Dr. Torpy of this secured note and deed of trust was bona fide and for value, we have given the matter close consideration and have read and re-read the evidence on that question. We have come to a different conclusion than that reached by the trial judge and it will do no good and unduly lengthen this opinion to set forth the evidence in detail in order to justify our conclusion. We will only mention some of the salient facts.

It is the law that when it was shown that the title of Edward Leitner to this secured note was defective and acquired in fraud, and it was so defective when he acquired it under such circumstances as amounted to fraud (Sec. 2683, R. S. 1929), then the burden of

evidence was on Dr. Torpy and those claiming under him to show that his purchase of the note was in good faith and for value and without any notice of the fraudulent character of Edward Leitner's acquisition and holding of the note. [Sec. 2687, R. S. 1929; Downs v. Horton, 287 Mo. 414, 425, 431, 230 S. W. 103; Guaranty Bank & Trust Co. v. McGirk State Bank (Mo. App.), 294 S. W. 456; Dowling v. Grand Ave. Bank, 216 Mo. App. 86, 94, 267 S. W. 1; Williams v. Schmeltz (Mo. App.), 14 S. W. (2d) 966, 968.] After carefully considering the evidence, we do not think that defendants have sustained this burden. In fact, defendants did not produce any evidence on this subject, the evidence, while that of Edward Leitner and Dr. Torpy, being produced by plaintiff in the form of depositions taken by plaintiff and the examination taken by the referee in bankruptcy, and neither the Leitners nor Dr. Torpy attended the trial of this case and they are not represented in this court, though it is apparent that Dr. Torpy is vitally interested in this case as he claims full ownership of this $11,000 secured note plus the interest for several years and he pledged it to Brinkman as collateral security for only $6,000 which he yet owes. Dr. Torpy's evidence, we think, clearly shows that he was not in a financial condition to purchase this note as an investment, which he says was his only motive. He had no business or source of income other than the ordinary medical practice of a doctor in a small village. He had accumulated little visible property and had not been a money lender or investor. It had been taking all his earnings to support his family and educate his two daughters. It also appears that in Wisconsin he had to make annual statements of his income and expenses for the purpose of taxation and these tax reports for several years prior to this alleged purchase and a few years afterwards showed only a taxable yearly net income of a few hundred dollars and no income from notes or bonds or from money loaned or investments. He kept a bank account in the only bank at Minoqua and this showed a regular bank account for several years preceding this transaction and afterwards with a balance of never more than $300 or $400 and generally less. This bank account showed frequent deposits of small amounts and numerous small checks. At no time in December, 1925, and January, 1926, when the alleged purchase of this note was made, did his balance in the bank exceed $100. In fact, Dr. Torpy testified that while he paid young Leitner $10,000 in cash and Liberty Bonds, he did not give any check or draw out any money from the bank to do so. His version of the transaction was that young Leitner, who worked at add jobs as an electrician, spoke to him first in December, 1925, about selling him this $11,000 secured note; that on the second day in January, 1926, when the sale was consummated and the note delivered, young Leitner came to him with this secured note in the evening after the bank was closed and offered to sell it

to him for $10,000, which offer he accepted; that young Leitner said he must have the money all in cash that evening and could not wait to close the deal till the bank opened the next morning. Dr. Torpy said he had some $4500 to $5500 in cash and Liberty Bonds in a safety box of some kind which he kept in his house; that he then called on some three or four friends and neighbors who also had cash and Liberty Bonds at their homes and borrowed from them in various amounts some $4500 more in cash and Liberty Bonds, making the total of $10,000 which he paid over to young Leitner that same evening and received the $11,000 note and deed of trust indorsed by young Leitner without recourse. There were no checks or notes or writing of any kind given in connection with this transaction. When young Leitner was questioned in giving his deposition as to what he did with the $10,000, largely in cash, which he received for this secured note, he declined to answer the question on the ground that it would tend to incriminate him. He did this on advice of his attorney, Mr. Omelia. Dr. Torpy also claimed this same immunity on the same attorney's advice when questioned as to some of the details of this transaction. It will be noticed that the date of the alleged sale of this secured note by young Leitner to Dr. Torpy was in the month preceding the trial and judgment in the damage suit and there is nothing to fix this as being the date of the sale of the note except the recollection of the buyer and seller, Edward Leitner and Dr. Torpy. The evidence also is that Dr. Torpy had never seen the St. Louis property, did not know or inquire how young Leitner acquired it, and only knew what young Leitner told him as to the value of the property and improvements thereon. He did not even remember whether he saw a certificate of title. After this sale of the secured note to Dr. Torpy it was shown that young Leitner collected the interest thereon and that he tried to sell the secured note to a number of real estate men in St. Louis, as well as to the local banker at Minoqua. He said he did this as agent for Dr. Torpy under an agreement to share in the profits, but Dr. Torpy denied that he ever authorized young Leitner to sell this secured note.

Dr. Torpy could give no satisfactory explanation of how he paid back the money he borrowed from these friends on this occasion except he said that he paid it back in cash in a short time, but his bank account in no way reflected any such transaction. Dr. Torpy held the secured note some eighteen months after he purchased it and says he told nobody, not even his wife, that he owned it, though he had used some of her money in purchasing it. He never collected any interest on it except what young Leitner collected and he admitted that no interest was paid after plaintiff's *lis pendens* was filed. About September 1, 1927, he testified that he needed some money and tried to sell the note with at least two interest payments then past due to Mr. Brinkman, who was a summer visitor at Minoqua. Brinkman

refused to buy the note outright but with little or no knowledge of the property or title agreed to and did loan Dr. Torpy $6,000 on this secured note as collateral security. Brinkman says he did this because he had confidence in Dr. Torpy personally. Plaintiff's *lis pendens* was then on file. Neither Brinkman nor the Lafayette Bank, from whom he borrowed $10,000 on this collateral security, ever collected any interest on the secured note. Although Dr. Torpy testified that he borrowed the $6,000 because he was in need of money and received a check for the $6,000, yet when asked what he did with the money he thus borrowed, he replied that "I spent it in my own business;" that he did not deposit it in any bank but "paid honest debts with it." His attorney, Mr. Omelia, who represented all the defendants, except possibly the Lafayette Bank, in the taking of depositions, the bankruptcy proceedings, etc., then asked him this suggestive question: "When you got this check of $6,000 you mailed it to me from Minoqua with your indorsement and told me that you would like to *have me keep the money* until further notice and to possibly invest it if that could be done to advantage." To this suggestion the witness readily assented. Other pertinent facts bearing on this issue might be mentioned.

We, therefore, hold that the trial court erred in holding that Dr. Torpy was a purchaser of this secured note and deed of trust in good faith and for value and in dismissing plaintiff's bill. The judgment is, therefore, reversed and the cause remanded to be proceeded with in accordance with this opinion. *Ferguson* and *Hyde, CC.,* concur.

PER CURIAM:—The foregoing opinion by STURGIS, C., is adopted as the opinion of the court. All the judges concur.