**Morris GREENBERG, Plaintiff-Respondent,**

**v.**

**Mary MORRIS, now known as Mary Sticklen, Executrix of the Estate of Sam Morris, and Mary Morris, now known as Mary Sticklen, Defendants-Appellants.**

No. 53603.

Supreme Court of Missouri, Division No. 2.

Dec. 31, 1968.

Motion for Rehearing or to Transfer to Court En Banc Denied Feb. 10, 1969.

Max M. Librach, Lloyd L. Schainker, St. Louis (John Grossman, St. Louis, on the brief), for respondent.

Dubail, Judge & Kilker, St. Louis, Rosenblum & Goldenhersh, Clayton, for appellants.

HOLMAN, Chief Justice.

In this action plaintiff sought to recover the alleged balance due on a $25,000 promissory note. The makers of the note, Sam Morris and Mary Morris, were the original defendants. Sam died before the case was tried and Mary, as executrix of his estate, was substituted in his stead. Mary subsequently remarried and is now known as Mary Sticklen. Defendants pleaded that the note was originally issued without any consideration and that plaintiff was not a holder in due course. They also filed a counterclaim in which the relief sought was an order cancelling said note. A jury was waived and upon a trial before the court a judgment was entered for plaintiff for the principal balance of $23,728.40, and interest in the sum of $5,220.24. A judgment was also entered for plaintiff on defendants' counterclaim. Defendants have duly appealed.

There is very little dispute concerning the facts. The following factual statement is supported by substantial evidence and we find the facts stated to be true.

In the year 1962 Sam and Mary Morris were the owners of the real estate located at 600 South Brentwood in Clayton, Missouri. In June of that year the Morrises made application for a new loan on the property through Mr. Luther A. Blue with the Oren E. and R. G. Scott Real Estate Company. Mr. Blue was able to obtain a loan for them in the amount of $255,000. However, the deed of trust was prepared in the amount of $280,000 and secured what was described as a Series "A" note in the amount of $255,000, and a Series "B" note in the amount of $25,000, the deed of trust providing that the Series "A" note would take precedence over the Series "B" note. Both notes were made payable to Norma Barrow, an employee of the Scott Company, who was a straw party, and who endorsed each of the notes without recourse shortly after they were executed. The "B" note was to be paid in monthly installments of $175 each, beginning August 1, 1962, with interest to be deducted from each monthly payment before crediting the balance on the principal. The makers of the

notes received no money because of their execution of the Series "B" note, and after it was endorsed by the payee it was delivered to them and retained by them until they sold the property a few weeks later. The Series "B" note was executed by Mr. and Mrs. Morris upon the suggestion of Mr. Blue who explained in his testimony that while the loan was for $255,000 the "B" note was prepared and signed so that if Mr. Morris decided to sell the property, and the purchaser had only a small down payment, the financing would already have been accomplished to the extent of $25,000 over and above the amount due on the "A" note by having the purchaser assume and agree to pay the "B" note which the Morrises would retain and collect from the purchaser. In other words, it was considered a sort of advanced financing in the event it was needed on a subsequent sale, but, if it was not needed, the Morrises could have had it cancelled and released of record at any time.

In a contract dated June 23, 1962, not closed until August of that year, the Morrises sold this property to an attorney named William Sabath. The sale price was $273,000, and obviously the "B" note was not considered as a valid loan which would continue as a lien on the premises at the time of the contract because that instrument recited that there was a deed of trust on the premises for $255,000 and that the purchaser was to pay $18,000 in cash. Before the Sabath transaction was completed the Morrises delivered the "B" note to their agent, Mr. Oxenhandler, at the Title Insurance Company where the transaction was closed. Mrs. Morris testified that she delivered it "because it had to go along with the papers pertaining to the building in order to have a clear title for the next buyer, and it was, in my opinion, to be removed from record according to the sales contract, which says, 'Sold with a motgage of two hundred fifty-five thousand dollars ($255,000) and no others.'"

However, the note was not cancelled or released of record and came into the hands of Mr. Sabath who kept it in his safe deposit box until he sold the property about a year later. At that time the property was conveyed to Willard Oxenhandler and the "B" note delivered to him. Apparently, Oxenhandler received the property primarily in satisfaction of a real estate commission owed him by Sabath.

On November 5, 1963, Mr. Oxenhandler sold the note to plaintiff for the sum of $17,450—$15,000 of which was paid on that date and the $2,450 balance was to be paid within five years, or when the entire amount of the note had been paid to plaintiff, apparently whichever occurred first. The sale was consummated at the Lindell Trust Company, the parties being assisted by Russell Greenleaf, vice president. Plaintiff at that time borrowed the $15,000 from the bank, receiving a check therefor which he endorsed and delivered to Mr. Oxenhandler. No one had made any payments on the "B" note up to that time, but at Mr. Oxenhandler's direction Mr. Greenleaf entered a notation on the note that the balance due on that date was $24,169.28, which had the effect of crediting the note with all of the $175.00 monthly payments which should have been made, according to the terms of the note, between the time the note was executed and the date it was sold. At that time Mr. Oxenhandler told plaintiff and Mr. Greenleaf that no payments had been made on the note but that he would start immediately paying the monthly payments and would continue to do so as long as he owned the property. Plaintiff knew Mr. and Mrs. Morris at that time and occasionally came in contact with them socially, but he did not talk with either of them about his contemplated purchase of this note. When he later told Mr. Morris that he had purchased the note Mr. Morris became angry because he had bought it without first talking with him.

Monthly payments were made and credited on the note to and including July 6, 1964. In August 1964 the deed of trust was foreclosed and the property was purchased by

Mr. and Mrs. Morris who did so because they were personally liable upon the $255,000 note secured by the deed of trust. The sale price was no more than the amount due on the "A" note. On November 20, 1964, the plaintiff had the sheriff serve a written notice upon Sam and Mary Morris notifying them that the Series "B" note was in default and that he was exercising the option provided in the deed of trust in declaring the entire principal amount due and payable at that time.

In a case of this nature we review the record de novo and determine the weight and value to be accorded the evidence and arrive at our own conclusions based upon the enrtire record. In so doing we give due deference to the opportunity of the trial judge to observe and hear the witnesses and to judge their credibility. Also, the judgment should not be set aside unless clearly erroneous. Civil Rule 73.01(d), V.A.M.R. The deference rule is not of much assistance in this case because there was very little conflict in the evidence. Our primary task is to determine the legal effect of the testimony and other evidence.

In our review of the evidence we have reached the conclusion that there was no consideration for the note at the time it was originally signed and issued by Sam and Mary Morris and that it was therefore unenforcible by anyone except a holder in due course. Sections 401.052 and 401.058 RSMo 1959, V.A.M.S.; Wohlschlaeger v. Dorsey, Mo.App., 206 S.W.2d 677 [6].

At the time the note was sold to plaintiff there were 16 monthly installments that were due and unpaid according to the terms of the note. And, although these payments were then credited on the note plaintiff was advised that they had not actually been paid. It is well settled that "one who purchases a note payable in instalments, some of which instalments have matured but are unpaid, is not a holder in due course as to any portion of the note, the whole note being dishonored, where the purchaser had notice of the default." Annotation, 170 A.L.R. 1029. To like effect see also 10 C.J.S. Bills and Notes § 313, p. 800; McCorkle v. Miller, 64 Mo.App. 153 [1]; Vette v. La Barge, 64 Mo.App. 179 [1]; George v. Surkamp, 336 Mo. 1, 76 S.W.2d 368 [8]; Standard Insulation and Window Co. v. Dorrell, Mo.App., 309 S.W. 2d 701 [2].

Plaintiff, however, contends that he is a holder in due course because there was actually no default in the payment of any installment due under the terms of the note until some eight months after he purchased it. His theory is that because the note and the property were owned by the same parties until November 5, 1963, there was no obligation to pay the installments; that such a payment would have been useless since it would have been the same as taking money out of one pocket and putting it into another. While we agree that there was no practical reason for payments to have been made prior to November 5, 1963, we do not think that fact would constitute plaintiff a holder in due course. If plaintiff actually knew the true facts concerning the execution and transfer of the note he certainly would not be a holder in due course. If he did not know those facts then his knowledge that the installments had not been paid should have put him on inquiry. That is the reason behind the statutory requirement. In McCorkle, supra, it is said that "[t]he principle is well established * * * that, where the principal of a note is payable in installments, a failure to pay one of them when due makes the note dishonored paper; that this is so whether the whole debt is thus, by the terms of the instrument, rendered due or not; and that a subsequent transferee who takes the note in that condition therefore takes it subject to all equities. The reason of the rule is that, where one or more of the installments remain due, the presumption arises that there is some valid reason for the failure or refusal to pay, which, if established, would likely go to the defeat of the entire

debt, and thus all subsequent purchasers or holders of the discredited paper are put on inquiry." See also, Archibald Hdwe. Co. v. Gifford, 44 Ga.App. 837, 163 S.E. 254 [1].

■■ As stated in his brief plaintiff also contends that "defendants received valuable consideration in the original execution of the 'B' note, in that they had the benefit of secondary financing in the event of sale of their property by them, and in addition its execution and recording increased the salability of the property to persons who might not have sufficient cash with which to purchase the property thereafter, thereby giving to defendants a thing of value, sufficient to support a consideration in a contract." There is no merit in that contention. An applicable definition of consideration is " 'a benefit to the party promising, or a loss or detriment to the party to whom the promise is made.' 'Benefit,' as thus employed, means that the promisor has, in return for his promise, acquired some legal right to which he would not otherwise have been entitled, and 'detriment' means that the promisee has, in return for the promise, forborne some legal right which he otherwise would have been entitled to exercise." 17 C.J.S. Contracts § 70, pp. 747, 748. In other words, legal consideration contemplates two parties and ordinarily some consideration must flow from both parties. Moehling v. W. E. O'Neil Construction Co., 20 Ill.2d 255, 170 N.E.2d 100 [3]. Here, there was really only one party to the note. It was made payable to a straw party who immediately endorsed it and returned it to the Morrises. They were the true owners of the note at the time it was executed. There was no consideration flowing to the Morrises from the payee or from any other person. They could not furnish a valid consideration to themselves. Plaintiff is confusing consideration with motive. As stated in 17 Am.Jur.2d, § 93, pp. 436, 437, "[t]he motive which prompts one to enter into a contract and the consideration for the contract are distinct and different things. Parties are led into agreements by many inducements, such as the hope of profit, the expectation of acquiring what they could not otherwise obtain, the desire of avoiding a loss, etc. These inducements are not, however, either legal or equitable consideration, and actually compose no part of the contract." In support of this point plaintiff has cited the case of Mayers v. Groves Bros. & Co., Mo. App., 22 S.W.2d 174, but it wholly fails to support his contention.

■ Although not stated in plaintiff's points relied on, we find in the argument portion of the brief the statement that where one of two innocent parties must suffer, the loss must fall on the one whose negligence brings it about. It is suggested that that rule should be considered in determining the quantum and quality of proof necessary to establish the defenses interposed by defendants. We find it difficult to follow that reasoning. However, in any event, while we recognize that the Morrises were negligent, we doubt that plaintiff may be considered an innocent party since he was not a holder in due course. Moreover, the rule stated is an equitable doctrine, Bost v. McFarland, 229 Mo.App. 776, 81 S.W.2d 350 [10], and we rule that it should not be applied under the facts and circumstances of this case.

The conclusions we have reached make it unnecessary to consider other points briefed.

As we have indicated the judgment for plaintiff should be reversed. In that situation we see no occasion for entering a judgment for defendants on their counterclaim. The adjudication herein has the effect of cancelling the note.

Judgment reversed.

All concur.